In re HOUBIGANT, INC., et al., Debtors.

HOUBIGANT, INC. and Parfums
Parquet, Inc., Plaintiffs,

v.

ACB MERCANTILE, INC., ACB Fragrances and Cosmetics, Inc., Giacomo Giuliano, Augustine Celaya and Gilles Pellerin, V & B Distributors, Canada, Inc., Harold Schiff, A. Rosenblum Sales, Inc., and Rosenblum, Defendants.

ACB MERCANTILE, INC. and ACB
Fragrances and Cosmetics, Inc.,
Counterclaim–Plaintiffs,

v.

HOUBIGANT, INC., Parfums Parquet, Houbigant, (1995) Ltd. (f.k.a. 3088766) Canada, Ltd., Michael Sherman, Luigi Massironi, Robert Graber, Thomas Bonoma, Renaissance Cosmetics, Inc., Kidd Kamm & Company, CTC International Group, Ltd., Brad Robinson and Chemical Bank New Jersey, N.A. (as agent for itself and National Westminster Bank U.S.A.), Counterclaim Defendants.

No. 95 Civ. 2467 (RWS).

United States District Court,
S.D. New York.

Oct. 17, 1995.

Kaye, Scholer, Fierman Hays & Handler (Karen E. Katzman, Thomas A. Smart, Scott M. Berman, Elizabeth Forman, Yoon Hi Greene, of counsel), New York City, for Plaintiff/Counterclaim Defendants Michael

Sherman, Luigi Massironi and Robert Graber.

Parker Chapin Flattau & Klimpl, LLP (Stephen G. Rinehart, Barry J. Brett, Michael D. Friedman, Gilbert C. Hoover, IV, of counsel), New York City, for Plaintiff/Counterclaim Defendants Parfums Parquet, Houbigant Ltee, Thomas Bonoma, Renaissance Cosmetics, Kidd Kamm, CTC Intl. and Brad Robinson.

Stroock, Stroock & Lavan (Brian M. Cogan, James A. Shifren, of counsel), New York City, for Counterclaim Defendant Chemical Bank.

Marcus Montgomery Wolfson, P.C. (Sam P. Israel, Lisa Buckley, of counsel), New York City, for defendant ACB Mercantile Inc.

## OPINION

SWEET, District Judge.

The ACB Defendants [1] have moved to dismiss the complaint of Plaintiff/Debtor Houbigant, Inc. ("Houbigant"). Houbigant and Plaintiff PPI have each moved to dismiss all of the counterclaims asserted against them by ACB. Counterclaim–Defendant Chemical Bank ("Chemical") has moved to dismiss the claim asserted against it by ACB. For the reasons discussed herein, the motions are denied in part and granted in part.

### Parties

Houbigant is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. Houbigant is the parent of a group of domestic and foreign companies which marketed and distributed perfumes and toiletries worldwide. On November 18, 1993 (the "Filing Date"), Houbigant and certain of its affiliates (collectively the "Debtors") filed voluntary petitions in this District for relief under Chapter 11 of the Bankruptcy Code. Since that time they have continued in possession and control of their businesses and assets as debtors in possession.

1. The ACB Defendants include ACB Mercantile, Inc. And ACB Fragrances and Cosmetics, Inc. (collectively "ACB companies") and their officers, directors and shareholders, Augustine Celaya ("Celaya"), Giacomo Giuliano and Gilles Pellerin (collectively the "Individual ACB Defendants").

Since filing the petition, Houbigant discontinued its design, marketing and distribution operations and became a trademark licensor. *In re Houbigant, Inc.*, 182 B.R. 958 (Bankr. S.D.N.Y.1995).

Plaintiff Parfums Parquet, Incorporated ("PPI") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. On June 2, 1994 the Bankruptcy Court authorized Houbigant to implement and effectuate a license agreement with PPI[2]. In exchange for royalty payments, Houbigant granted to PPI the exclusive right and license in "the Territory[3]" to: a) manufacture in the Territory the Products covered by the Trademarks (the "Licensed Products"); b) distribute, use and sell throughout the Territory the Licensed Products; and c) use the Trademarks in conjunction with the Licensed Products and all advertising and letterheads and collateral promotional material in the Territory. PPI was Houbigant's exclusive United States licensee.

Defendant ACB Mercantile, Inc. ("ACB Mercantile") is a Canadian corporation with its principal place of business in Quebec, Canada.

Defendant ACB Fragrances and Cosmetics, Inc. ("ACB Fragrances") is a Canadian corporation with its principal place of business in Quebec, Canada. ACB Mercantile and ACB Fragrances are collectively referred to as "ACB companies." ACB companies are Houbigant creditors in the Bankruptcy proceedings. ACB Fragrances and Houbigant entered into a series of agreements in April 1993 by which Houbigant granted ACB Fragrances an exclusive license to manufacture, sell, and distribute certain Houbigant products in Canada. An asset purchase agreement dated December 12, 1994 (the "Asset Purchase Agreement") conveyed ACB Fragrance's business to Counterclaim Defendant PPI–Canada, a Canadian affiliate of plaintiff PPI.

Defendant Augustine Celaya ("Celaya"), an officer and principal shareholder of ACB Mercantile, is an individual residing in Texas.

Defendant Giacomo Giuliano ("Giuliano"), an officer and principal shareholder of ACB Mercantile, is an individual residing in Quebec.

Defendant Gilles Pellerin ("Pellerin"), an officer and principal shareholder of ACB Mercantile, is an individual residing in Quebec.

Counterclaim Defendant PPI–Canada is a Canadian corporation and a wholly-owned subsidiary of plaintiff, PPI. According to the Counterclaims, PPI–Canada has offices in Cambridge, Massachusetts and transacts business both directly and through its parent-corporations, PPI and Renaissance, within the Southern District of New York.

Counterclaim Defendant Renaissance Cosmetics Inc. ("Renaissance"), is a corporation engaged in various aspects of the fragrance business and owns all of the common stock of plaintiff, PPI. Renaissance conducts substantial business in New York.

Counterclaim Defendant Kidd Kamm & Co. ("Kidd Kamm") is a Connecticut company, and an affiliate of Renaissance, PPI and PPI–Canada. Kidd Kamm creates and invests in entities that manufacture and distribute fragrances in the United States and abroad and it conducts substantial business with this District. Kidd Kamm, PPI, PPI–Canada and Renaissance are referred to collectively as the PPI Entities.

Counterclaim Defendant Luigi Massironi ("Massironi") is the Chief Operating Officer of Houbigant. Massironi joins the motion to dismiss ACB's counterclaims, while reserving his right to contest service.

Counterclaim Defendant Michael Sherman ("Sherman") is a reorganization specialist and is Executive Vice President of Houbigant in charge of bankruptcy matters. Sherman joins the motion to dismiss ACB's counterclaims, while reserving his right to contest

---

**2.** PPI was then called New Fragrance License Corp.

**3.** The License Agreement defined the Territory as "all countries, possessions, territories and U.S. military outlets and PX's located in North America, Central America, South America, excluding Canada but including Hawaii."

service. Plaintiffs allege that Sherman was not and was not alleged to be associated with Houbigant prior to the Filing Date, November 18, 1993.

Counterclaim Defendant Thomas Bonoma ("Bonoma") is Chairman and Chief Executive Officer of Renaissance and Chairman of PPI.

Counterclaim Defendant Chemical (as agent for itself and National Westminster Bank U.S.A.) is a banking corporation that conducts business worldwide. The Counterclaims allege that Chemical holds a security interest in most if not all of Houbigant's assets, including the alleged trademarks that are the subject of this action and have been actively involved in the day to day management of Houbigant's business affairs since at least October 1993.

Counterclaim Defendant Robert Graber ("Graber") was the Chief Financial Officer of Houbigant until January 1995.

Counterclaim Defendant CTC International Group, Ltd. ("CTC") is a detection and surveillance company, which maintains an office in West Palm Beach, Florida.

Counterclaim Defendant Brad Robinson ("Robinson") is an employee of CTC.

### Prior Proceedings

Houbigant and PPI filed an adversary proceeding in Bankruptcy Court in the Southern District of New York on April 4, 1995 pursuant to section 105(a) of Title 11 of the United States Code, alleging violations of the Lanham Act, various statutes of the State of New York and the common law, seeking damages and to enjoin the ACB defendants from infringing upon rights in certain Houbigant trademarks, unfair competition and injuring their business reputations or diluting the distinctive quality of the trademarks.

On April 11, 1995 the defendants moved to withdraw the reference to the District Court. By order to show cause, signed on April 11, 1995, the motion was set for hearing on April 14, 1995. On April 14, the parties appeared before this Court, and an order was entered postponing argument on the motion until May 3, 1995 [4].

On May 5, PPI's affiliate, PPI–Canada, commenced an action against ACB in Canada alleging that ACB sold products infringing Houbigant's trademarks.

On May 17, 1995, the parties appeared before the Court and the motion to withdraw adversary proceeding from the Bankruptcy Court was granted, with no opposition voiced, on consent of all parties.

On May 26, 1995, the plaintiffs filed the First Amended Complaint (the "Complaint"), no answer having yet been filed by the defendants. The complaint recites seventeen claims and names the ACB companies, Celaya, Giuliano, Pellerin, V & B Distributors, Harold Schiff, A. Rosenblum Sales, Inc., and Bernard Rosenblum as defendants.

By Order of the Bankruptcy Court dated June 14, 1995, Houbigant's "Third Amended Joint Disclosure Statement Under Section 1125 of the Bankruptcy Code," was approved, and Houbigant and its affiliated debtors were authorized to commence the process of soliciting acceptances of the Plan.

On June 16, 1995 ACB filed an answer and counterclaims against Houbigant, PPI, and third-party defendants Luigi Massironi, Robert Grabet, Thomas Bonoma, Renaissance, PPI Canada (a wholly owned subsidiary of plaintiff PPI), Kidd Kamm & Company, CTC International Group, Brad Robinson, Chemical, and Michael Sherman. These third-party defendants are not parties in the bankruptcy proceeding. The seventeen Counterclaims allege fraud against Houbigant, Massironi, Sherman and Graber (Count I), violations of the Canadian Trademark Act against Houbigant (Count II), breaches of fiduciary duties against Houbigant, Massironi, Sherman and Graber (Count III), breaches of covenants of good faith and fair dealing against Houbigant, Chemical and the PPI Entities (Count IV), civil conspiracy to defraud against all counterclaim defendants except Chemical, Robinson and CTC (Count V), unfair competition under the Lanham Act against Houbigant, Massironi, Sherman and Graber (Count VI); injury to business under New York Business Law against Hou-

4. The parties agreed to an additional postponement until May 17.

bigant, Massironi, Sherman and Graber (Count VII), violation of New York Business Law regarding false advertising against all counterclaim defendants except Chemical, Robinson and CTC (Count VIII); common law unfair competition against Houbigant, Massironi, Sherman and Graber (Count IX); tortious interference with contracts against Houbigant, the PPI Entities, Bonoma, Sherman and Massironi (Count X); defamation *per se* against Houbigant, PPI, PPI–Canada, Bonoma, CTC, Robinson and Sherman (Count XI); defamation under the Canadian Trademarks Act against Houbigant, the PPI Entities, Bonoma, CTC, Robinson and Sherman (Count XII); contractual indemnification against Houbigant (Count XIII); indemnification implied in law against Houbigant (Count XIV), post petition breaches of contract against Houbigant and PPI–Canada (Counts XV and XVI, respectively); and trademark cancellation under the Lanham Act against Houbigant and PPI (Count XVII).

A stipulation and order of settlement between plaintiffs and non-ACB defendants named in Houbigant's complaint, including A. Rosenblum Sales, Bernard Rosenblum, Harold Schiff, and V & B distributors Canada was signed by the Honorable John S. Martin, *acting in his Part One capacity*, on July 14, 1995.

The claims in the Complaint remaining against ACB after the settlement with the non-ACB defendants include: violations of the Lanham Act § 32, 15 U.S.C. § 1114 (Claim I); violations of the Lanham Act § 32(a), 15 U.S.C. § 1125(a) (Claim II); common law trademark infringement (Claim III); violations of the Tariff Act, 19 U.S.C. § 1526(a) (Claim 4); injury to business under New York General Business Law ("GBL") § 368–d (Claim 5); intent to deceive (New York GBL § 133) (Claim 6); for deceptive practices and false advertising (New York GBL §§ 349(a), 350, 350–a) (Claim 7). In addition, PPI alleges the following claims against the ACB defendants: violations of the Lanham Act § 32, 15 U.S.C. § 1114 (Claim 8); violations of the Lanham Act § 32(a), 15 U.S.C. § 1125(a) (Claim 9); common law trademark infringement (Claim 10);

injury to business under New York General Business Law ("GBL") § 368–d (Claim 11); intent to deceive (New York GBL § 133) (Claim 12); for deceptive practices and false advertising (New York GBL §§ 349(a), 350, 350–a) (Claim 13); tortious interference with business relations (Claim 15). Finally PPI, claiming rights as a third party beneficiary of the license agreement between ACB Mercantile and Houbigant, alleges damages for a breach of the agreement (Claim 16) and as a third party beneficiary for an alleged breach of the Asset Purchase Agreement against the ACB Companies, Giuliano, Celaya and Pellerin (Claim 17).

Between July 14 and July 24, 1995 motions were made by Houbigant, PPI, Chemical Bank and ACB to dismiss the claims against each of them by the opposing party. Houbigant's motion to remand this proceeding back to Bankruptcy Court was filed on July 17, 1995. The parties briefed these motions extensively with reply briefs filed to each of the five sets of motions. Argument was heard for several hours on August 3, 1995, and the motions were considered fully submitted at that time.

By opinion of August 24, 1995 Houbigant's motion to have this adversary proceeding remanded to Bankruptcy Court *in toto* was denied. Issues pertaining to administrative and filing deadlines were remanded to the Bankruptcy Court. Decision was reserved on the four motions to dismiss, which are hereby resolved.

### *The Pleadings*

The Complaint states that:

36. On ... September 30, 1994 the ACB Companies executed a Letter of Intent whereby they agreed in principle to negotiate a transaction whereby all of the assets of the ACB Companies would be sold to an affiliated company of PPI, known as 3088766 Canada Limited ("PPI Canada"). During the period between the signing of the Letter of Intent and the closing of the asset purchase transaction, the ACB Companies expressly agreed and undertook not to engage in any transaction outside the regular course of business and to preserve and maintain the assets of the ACB companies.

37. On December 12, 1994, an Asset Purchase Agreement was entered into between PPI Canada, as Purchaser, the ACB companies, as Sellers, and Augustine Celaya, Jack Giuliano and Gilles Pellerin as shareholders of all of the common stock of the ACB Companies. Pursuant to the Asset Purchase Agreement, PPI Canada agreed to pay the sum of $8,000,000 (Canadian) and assume certain liabilities, in exchange for all of the assets of the ACB Companies (the "Acquired Assets"). The Acquired Assets included all of the ACB Companies' intellectual property and all rights under existing distribution agreements and license agreements, including the rights to manufacture and distribute Houbigant's trademarked products in Canada under the Canadian License. The agreements contained restrictive covenants against ongoing competition by the sellers and their shareholders.

The complaint alleges that in violation of the agreements, and at the direction of Giuliano, Pellerin and Celaya, in October through December 1994 [5] the ACB companies manufactured large quantities of fragrances and toiletries appearing to be Licensed Products, but which were counterfeit products of inferior quality designed for sale in the United States and that these goods were "materially different from and inferior to, the genuine Chantilly fragrance." The complaint further alleges that the manufacture of these products was not reflected on the books and records of the ACB Companies delivered to PPI under the Asset Purchase Agreement. These actions were, according to Plaintiffs, in violation of Houbigant's trademark rights, of the Canadian License and of PPI's exclusive U.S. license. It is further alleged that at least 150,000 bottles of this Chantilly (product code 13406—not a product code utilized for Canadian production) were imported into the United States and that certain quantities were sold to distributors in the New York City area where they are being marketed and sold to the public as genuine Houbigant trademarked fragrances. It is further alleged that prior to shipment into the United

States each of the counterfeit Chantilly products was altered by affixing a label on the package indicating the size and content in accordance with United States labeling requirements, not appropriate for products intended for sale in Canada.

The complaint also alleges that on June 3, 1994 the ACB Companies transmitted by facsimile a copy of the Chantilly carton showing a United States label to be affixed to a carton made in Canada to an American dealer in diverted goods. Plaintiffs allege that in July, ACB Companies purchased the equivalent of a ten-year supply of purse spray bottles, that in November they produced enough bulk perfume to fill 66,000 spray bottles, designated by product codes (13044 and 13047) which were not Canadian codes, purchased labels appropriate for United States products in November and cartons for them in December, but that when PPI gained access to the Canadian warehouses on December 12, 1994 there were only 5,760 bottles in inventory and no records indicating sale of the product.

The complaint alleges that in November and December 1994, the ACB Companies manufactured 100,000 units of counterfeit Chantilly in the 75 milliliter size bearing the non-Canadian product code 13999 and that there are allegedly no records reflecting the sale of this product and none remains in inventory.

The complaint alleges that all of the "counterfeit" product was inferior to those made in accordance with the Houbigant standards and those made in the United States by PPI or those made by PPI–Canada for sale in Canada.

### The Counterclaims' Allegations

Pursuant to two agreements, both dated April 1, 1993, Houbigant sold ACB all of the outstanding stock of what was then its Canadian Affiliate, Houbigant Ltee (the "Sale Agreement") and granted to ACB the exclusive rights to manufacture, sell and distribute Houbigant's Parfum Parquet Division fragrance products throughout the territory of Canada and to use Houbigant "trademarks"

5. The complaint alleges that the manufacture and sales of these "counterfeit" products occurred before December 12, 1994 when the Asset Purchase Agreement between PPI Canada and ACB Companies was executed.

in connection with those products (the "ACB License Agreement")[6]. According to plaintiffs, the agreements expressly restricted the distribution of the products licensed thereunder to Canada. Complaint ¶ 35. The ACB License Agreement has a term of ten years, renewable for five years.

Consideration provided to Houbigant by ACB in exchange for these exclusive rights included an agreement to pay over a four year period certain of Houbigant's existing liabilities in the amount of $1,230,000.

ACB asserts that Houbigant and ACB agreed that the substantive laws of the Province of Quebec would govern controversies and issues arising under and in relation to the ACB License Agreement and the Sale Agreement and that in paragraph 25 "the parties further agreed ... that all disputes concerning the contract would be resolved by mandatory and binding arbitration."

By agreements dated October 22, 1993, Chemical Bank, which held a lien on all of Houbigant's assets, approved the transactions between Houbigant and ACB. To obtain that approval, ACB alleges that Houbigant assigned to Chemical its rights, title and interest in and to any amounts to be paid by ACB under the ACB License Agreement, and ACB agreed to make all payments due to Houbigant under the terms of the ACB License Agreement directly to Chemical. According to ACB, the parties to these agreements agreed that disputes would be governed by the law of Quebec.

For the first six months of the ACB License Agreement, ACB asserts that it successfully manufactured and that its distribution affiliate, Houbigant Ltee, successfully sold Houbigant's Parfum Parquet fragrances in Canada. In December 1993, the counterclaim complaint alleges that in breach of the License Agreement Houbigant ceased providing ACB with the essential oils it needed to manufacture the Parfum Parquet fragrances. This allegedly caused a reduction in production, an inability to fill orders, lost profits and damage to ACB's relationship with its customers.

After ACB secured an alternate supplier for the oils, ACB alleges that Houbigant undertook no action to examine the quality of the goods and that in December Houbigant shut down its quality control department.

In April 1994, ACB asserts that it discovered massive amounts of Parfum Parquet fragrance products manufactured in England offered for sale in Canada. ACB notified Houbigant and Chemical as well as Sherman, Graber and Massironi about the appearance of these goods and "demanded, under the express terms of the License Agreement, that they take action to foreclose the further influx of such goods." According to the complaint, the only response was from Massironi who advised ACB's principals that Houbigant knew nothing about the origin of the British goods.

In order to compete with the lower priced British goods, Houbigant Ltee asserts that it had no choice but to reduce its prices and sell more goods to a wider customer base.

After entering into to the ACB License Agreement, but before Chemical Bank approved the deal, Houbigant sold "massive quantities of Parfums Parquet products to certain distributors who were free to resell the goods anywhere in the world."

The counterclaims further assert that beginning in June 1993, Massironi authorized a series of "naked" licenses on behalf of various wholly-owned subsidiaries which authorized "third-parties to make and sell Parfums Parquet fragrances—including Chantilly and Raffinee—Worldwide, "without trademark restrictions" and according to specifications of the licensee's own choosing." These agreements were made with several European fragrance companies and collectively referred to in the counterclaim as the "Unilex Agreements."

With regard to the PPI License, the counterclaim complaint alleges that PPI, a subsidiary of Renaissance, entered into a license

---

6. The initial schedule of trademarks appended to this agreement included: Chantilly, Lutece, Monsieur Musk, and Alyssa Ashley and according to ACB was "intended to encompass all trademarks and tradenames that may in the future be adopted by the Licensee in connection with the products manufactured by the Licensee."

agreement with Houbigant on May 2, 1994 which granted PPI the exclusive rights to exploit Parfums Parquet products throughout the Western hemisphere, with the sole exception of Canada. PPI discovered enormous quantities of gray market product in its region. After PPI "came to understand that, although not disclosed by Houbigant before it entered into its agreement with PPI, Houbigant (and its affiliates) was the source of its gray market, secondary and 'knock off' competition," it negotiated for world-wide rights, with the exception of Canada. On August 10, 1994, PPI entered into such and agreement with Houbigant.

"Concerned with the importation of goods apparently emanating from Canada, PPI also resolved to acquire ACB's rights under the ACB License Agreement so as to complete its worldwide rights to exploit Houbigant's Parfums Parquet division fragrances."

On September 30, 1994 ACB and Renaissance, PPI's parent company, signed a nonbinding letter of intent that "anticipated the consummation of a sale of ACB's assets to PPI later that year." The asset purchase agreement between the companies was signed on December 12, 1994. Pursuant to the agreement "ACB sold all of its known assets, including its exclusive rights under the ACB License Agreement to Houbigant (1995) Ltd., (referred to herein as "PPI–Canada"), an affiliate of PPI." According to the counterclaim complaint, all disputes arising under the ACB–PPI Agreement are to be governed by the laws of Quebec, Canada.

By the terms of the ACB–PPI Agreement, PPI agreed to pay $830,000 due to Houbigant under the ACB License and Sale Agreements. Thus, upon the closing of the ACB–PPI Agreement, PPI–Canada paid Chemical Bank, as Houbigant's assignee and as required under the Bank Agreement, $830,000 (by wire transfer of Canadian dollars), which amount represented the bulk of ACB's financial obligations to Houbigant under the ACB License and Sale Agreements. Chemical Bank has also continued to accept royalty payments from PPI–Canada in accordance with the terms of the ACB License Agreement as assigned.

The ACB License Agreement contained a provision that Houbigant's prior written consent was required for any assignment of the underlying license rights. The contract also provided that Houbigant's consent could not be "unreasonably withheld." PPI warranted in the ACB–PPI agreement that it would obtain Houbigant's consent to the assignment.

A month after Chemical Bank accepted various payments directly from PPI–Canada in accordance with the ACB–PPI Agreement, Houbigant expressly refused to consent to the assignment. Houbigant then sent letters to ACB alleging that ACB was in default of obligations under the License Agreement, reserving the right to terminate the agreement. Having refused to consent to the ACB–PPI Agreement, Houbigant and PPI–Canada "entered into a 'side agreement' with PPI–Canada, whereby the parties expressly acknowledged that an assignment had occurred but agreed to enter into a new Canadian license agreement, in complete disregard for ACB's assignment and its rights under both the ACB License Agreement and the ACB–PPI Agreement . . ."

On March 13, 1995 Houbigant filed a notice of a hearing in Bankruptcy Court to "implement and effectuate a License Modification Agreement" with PPI. The revised License Agreement provided that PPI would pay Houbigant $2.7 million after an agreement between Houbigant and PPI for the Canadian territory became effective. ACB filed objections to the motion which, in part, noted the problem of the conflicting exclusive licenses—one with ACB and one proposed with PPI–Canada.

Having abandoned its attempt to effectuate a new agreement between Houbigant and PPI–Canada, ACB states that the PPI Entities continued their threats to sue ACB and rescind the ACB–PPI agreement when in March 1995, the PPI entities, with Houbigant's assent, hired an investigation firm to develop claims against ACB.

In April 1995, in apparent contradiction with its earlier representation that no assignment had occurred from ACB to PPI–Canada, Sherman testified in the Bankruptcy pro-

ceeding that Houbigant granted its consent to the ACB/PPI assignment.

ACB maintains that the goods produced in Canada, the subject of Plaintiffs' Complaint, were not counterfeit, but authorized under the license agreement and sold to one of the settling defendants, V & B, a Canadian fragrance distributor. ACB asserts that all of the goods made by ACB were authorized and conformed to specifications.

According to the Defendants, Houbigant has exercised no quality control since at least July 1993 and is "simply in no position to argue that any of its so-called trademarks were infringed by the manufacture and sale of 'nonconforming' products."

At an April 4 Hearing before the Bankruptcy Court, Houbigant failed to reveal that certain named distributors were, with Houbigant's approval, selling goods purchased overseas in both Canada and the United States, that the goods varied greatly from those offered for sale by PPI and ACB, that neither PPI or Houbigant ever took legal action against these other distributors on the basis of trademark violation or otherwise. The counterclaim admits that Plaintiffs did take out advertisements contending that the goods were "knock-offs."

Finally, the counterclaim complaint alleges that it was Houbigant's intention to conceal the Unilex Agreements until such time as all claims against it were barred by a Bankruptcy Court bar date. Defendants only learned about Houbigant's misconduct from third parties in March 1995.

### The Trademarks

Houbigant has registered trademarks for the following perfumes: Chantilly (Registration Number ("#") 865,906), Lutece (# 1,311,856"), Raffinee (# 1,264,630), Houbigant Raffinee (# 1,256,522), Demi-jour (# 1,488,987), Monsieur Musk (# 1,566,699), Presence (# 309,266).

### Discussion

### Standards for Reviewing Motion to Dismiss under Rule 12(b)(6)

In reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the trial court's function is, "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered...." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980). A motion to dismiss should not be granted unless, after viewing the plaintiff's allegations in a favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)), *cert. denied,* 507 U.S. 972, 113 S.Ct. 1412, 122 L.Ed.2d 784 (1993).

### ACB's Motion

ACB moves to dismiss the complaint against it on several grounds. First, ACB claims that the Court lacks personal jurisdiction over the ACB defendants. Second, if there is personal jurisdiction, ACB asserts that Canada and not the Southern District of New York is the appropriate forum. Finally, they assert that plaintiffs have not, and in fact cannot, state cognizable trademark infringement or unfair competition claims against the ACB Defendants under the Lanham–Trademark Act or New York common laws, or the ancillary claims.

### Jurisdiction Has Been Sufficiently Alleged

■ In order to demonstrate personal jurisdiction sufficiently to defeat a motion to dismiss, a plaintiff need only make a *prima facie* showing that jurisdiction exists. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985). Plaintiffs' complaint and affidavits are to be construed, and any doubts are to be resolved in the light most favorable to the Plaintiff. *Editorial Musical Latino Americana, S.A. v. Mar International Records, Inc.,* 829 F.Supp. 62, 64 (S.D.N.Y.1993); see also *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (on motion to dismiss pleadings are considered in light most favorable to pleader).

■ To determine personal jurisdiction over a non-domiciliary in a federal question case, this Court applies the long-arm statute of the forum state. *See Hubbell v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 961 (S.D.N.Y.1995); *Business Trends Analysts v.*

*Freedonia Group, Inc.*, 650 F.Supp. 1452, 1455 (S.D.N.Y.1987); *U.S. v. First Nat'l City Bank*, 379 U.S. 378, 381, 85 S.Ct. 528, 530, 13 L.Ed.2d 365 (1965).

New York's long-arm statute provides:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state; or 3. commits a tortious act without the state causing injury to person or property within the state, ... if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ...

N.Y.Civ.Prac.L. & R. § 302(a) (McKinney 1993) ("CPLR § 302(a)").

 Offering one copy of an infringing work for sale in New York, even if there is no actual sale, constitutes commission of a tortious act within the state sufficient to imbue this Court with personal jurisdiction over the infringers. *See Business Trends*, 650 F.Supp. at 1455–56 (shipment of one copy into New York; actual sale not necessary); *Metropa Co. v. Choi*, 458 F.Supp. 1052, 1054 (S.D.N.Y.1978) (trademark infringement; only New York contact of California defendant was mail order shipment of two wigs); *Honda Assocs., Inc. v. Nozawa Trading, Inc.*, 374 F.Supp. 886, 888–89 (S.D.N.Y.1974) (trademark infringement, actual sale not necessary; only New York contact of California defendant was mail order shipment of 3 karate uniforms valued at $37). This Court has jurisdiction even if the products for sale are offered through independent brokers in New York. See CPLR 302(a) ("in person or through an agent"); *Heritage House Frame & Moulding Co. v. Boyce Highlands Furniture Co.*, 88 F.R.D. 172, 173 (E.D.N.Y.1980). Other courts have upheld jurisdiction under

302(a)(1) based on contracts to ship goods "F.O.B." from a foreign port, provided goods are ultimately destined for delivery in New York. *See e.g., Cleopatra Kohlique, Inc. v. New High Glass, Inc.*, 652 F.Supp. 1254, 1257–58 (E.D.N.Y.1987).

Defendants are also subject to personal jurisdiction based on 302(a)(3) which establishes jurisdiction over a person who "commits a tortious act without the state causing injury to person or property within the state, ... if he ... expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ..." N.Y.Civ.Prac.L. & R. § 302(a) (McKinney 1993) ("CPLR § 302(a)." The New York courts have held that loss of customers or business constitutes an "injury" for the purpose of determining jurisdiction under CPLR Section 302(a)(3). *See Sybron v. Wetzel*, 46 N.Y.2d 197, 413 N.Y.S.2d 127, 385 N.E.2d 1055 (1978).

 Thus allegations that the ACB companies at the direction of Celaya, Giuliano, and Pellerin produced at least 18,920 liters of a fragrance identified as "Chantilly Eau de Toilette" and that at least 150,000 bottles were imported into the United States and that certain quantities were sold in the New York City area is sufficient to assert *prima facie* jurisdiction. Furthermore, the officers of a corporation are subject to jurisdiction under section 302(a)(1) if the corporation engages in purposeful activity in New York out of which the claim arises with the knowledge and consent of the individual officers and for their benefit. *See, e.g., Retail Software Services, Inc. v. Lashlee*, 854 F.2d 18 (2d Cir. 1988).

Thus, there are sufficient allegations in the complaint to support *prima facia* jurisdiction over the individual defendants, alleged to be officers and principal shareholders of ACB Mercantile who "personally authorized, profited from, directed" the acts alleged in the complaint that form the basis for claims of trademark infringement.

 Additionally, the ACB defendants have waived their right to challenge *in personam* jurisdiction. "Appearing and seeking

affirmative relief from the Court is the paradigm of such a waiver." *Andros Compania Maritima, S.A. v. Intertanker Ltd.,* 718 F.Supp. 1215, 1217 (S.D.N.Y.1989). When ACB filed its Answer and Amended Complaint and included ten additional counterclaim defendants, it waived its right to object to the jurisdiction of this court. *See e.g., Cargill, Inc. v. Sabine Trading & Shipping Co.,* 756 F.2d 224, 229 (2d Cir.1985) (in diversity action, looking to state law to determine waiver of jurisdictional defenses by assertion of counterclaim where no controlling federal rule could be found): *Textile Technology Exchange v. Davis,* 81 N.Y.2d 56, 595 N.Y.S.2d 729, 611 N.E.2d 768 (1993) (holding that defendant waived affirmative defense of lack of personal jurisdiction by asserting counterclaim unrelated to the claim asserted by plaintiff). While the counterclaims are not unrelated to the claims, they need not have been raised in this action.

■ "While the plaintiff ultimately bears the burden of establishing the existence of jurisdiction over defendants by a preponderance of the evidence, the burden should not be imposed on the plaintiff at the pleading stage ..." *Hubbell v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 962 (S.D.N.Y.1995) *quoting Soviet Pan Am Travel Effort v. Travel Comm. Inc.,* 756 F.Supp. 126, 130 (S.D.N.Y.1991). In the absence of an evidentiary hearing or further factual development through discovery, the pleadings and affidavits must be construed in the light most favorable to the plaintiff. *Id.* At this stage of the proceedings, the motions to dismiss the complaint on grounds of jurisdiction are denied.

### The Motion to Dismiss for Forum Non–Conveniens is Denied

■ "To prevail on a motion to dismiss based on *forum non conveniens,* a defendant must demonstrate that an adequate alternative forum exists and that considering the relevant private and public factors set forth in *Gilbert*[7], 330 U.S. at 508–09, 67 S.Ct. at 843, the balance of convenience tilts strongly in favor of trial in the foreign forum." *R. Maganlal & Co. v. M.G. Chemical Co., Inc.,*

942 F.2d 164, 167 (2d Cir.1991) (footnote added); *Lana International Ltd. v. Boeing Co.,* 1995 WL 144152 (S.D.N.Y. March 30, 1995).

■ The moving party must show that proceeding in this forum would be "unjust, oppressive, or vexatious" and not merely inconvenient for the party seeking dismissal. *Koster v. Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 832, 91 L.Ed. 1067 (1947); *American Home Assur. Co. v. Insurance Corp. of Ireland, Ltd.,* 603 F.Supp. 636, 640 (S.D.N.Y.1984).

■ The Court in *Gulf Oil* set out both the private and public interest factors to consider in a *forum non conveniens* motion. The private factors include: the relative ease of access to sources of proof, the availability of compulsory process for unwilling witnesses, the cost of obtaining attendance for willing witnesses, possibility of view of premises, if relevant, enforceability of possible judgment, and other practical problems that could make the trial protracted, difficult, or costly (*e.g.,* application of foreign law or translation of documents). *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. at 843. The public interest factors include: the administrative difficulties resulting from a backlog of litigation in the district, and the imposition of jury duty on a district having no relation to the litigation and the familiarity of the trial court with the applicable law. 330 U.S. at 508–09, 67 S.Ct. at 843. Plaintiff's choice of a forum which is not convenient to an adversary may not be allowed to vex or oppress the defendant through the infliction of undue expense or difficulty. However, unless a balance of these factors is strongly in favor of the party seeking to dismiss the action, in this case the ACB defendants, the plaintiff's choice of forum should not be disturbed. *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. at 843. This balance must be even stronger when, as here, the party who chose the forum is an American entity and the alternative forum is a foreign one. *See Olympic Corp. v. Societe Generale,* 462 F.2d 376, 378 (2d Cir.1972).

7. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

This case is distinguishable from *Lana International Ltd. v. Boeing Company*, 1995 WL 144152 (S.D.N.Y. March 30, 1995), a case which granted a motion to dismiss a Lanham Act case on *forum non conveniens* grounds, where the alternate forum was also Canada. In *Lana*, the Court found that "the majority (if not all) of the events giving rise to plaintiff's claim took place outside of the United States." *Id.*, at *3. While the acts of the ACB defendants are alleged to have occurred outside of the United States, the presence of the Bankruptcy proceeding in this District and Defendants' Counterclaims which allege acts outside of Canada result in a case that is significantly different from *Lana* in that the convenience factors, the thrust of the second prong of the *Gilbert* test, do not weigh as heavily outside of the United States.

In this case when many of the parties are already before the Bankruptcy Court in this district, where the alleged infringement was completed in this District, and where the inconvenience to the parties to travel from Quebec to New York is not great, the motion for transfer will be denied. Additionally, there is a strong policy in Bankruptcy to consolidate the proceedings. For these reasons, the motion to dismiss on grounds of *forum non conveniens* will be denied.

ACB has argued that the presence of a clause to arbitrate disputes in Canada, the case should be sent to Canada. Absent a motion to compel arbitration, however, the Court will not rule on this suggestion.

### The Lanham Act Claims Will not be Dismissed

The Lanham Act claims are based on 15 U.S.C. 1114 (Claim I) and 1125(a) (Claim 2), which, in relevant part for these claims, states:

Remedies; infringement; innocent infringement by printers and publishers

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive . . .

(2) Notwithstanding any other provision of this chapter, the remedies given to the owner of a right infringed under this chapter or to a person bringing an action under section 1125(a) of this title shall be limited as follows:

(A) Where an infringer or violator is engaged solely in the business of printing the mark or violating matter for others and establishes that he or she was an innocent infringer or innocent violator, the owner of the right infringed or person bringing the action under section 1125(a) of this title shall be entitled as against such infringer or violator only to an injunction against future printing.

15 U.S.C. § 1114

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of

such person with another person, or as to activities by another person or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act ...

15 U.S.C. § 1125(a) (1995 Supp.)

The Lanham Act is violated by importation of goods made abroad, if those goods differ from the domestic product of the exclusive domestic licensee. *See Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, 816 F.2d 68, 73 (2d Cir.), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). "The well established test for trademark infringement and unfair competition both under the Lanham Act and state law is likelihood of confusion. United States Courts have repeatedly found that the unauthorized importation into the United States is likely to result in confusion when there are material differences between the domestic and foreign goods." *PepsiCo, Inc. v. Torres*, 27 USPQ.2d 1948, 1993 WL 455222 at *2 (C.D.Cal.1993).

Plaintiffs have alleged that an inferior and counterfeit product bearing an unauthorized mark was manufactured for importation to the United States for sale. These are sufficient allegations to withstand a motion to dismiss. Claims one, two, three, eight, nine and ten will not be dismissed as a matter of law. ACB's arguments regarding the likelihood of confusion or the abandonment of the mark are factual issues not appropriate for consideration on a motion to dismiss.

### Tariff Act

The fourth claim is based on violation of the Tariff Act, which, in relevant part, reads:

(a) ... it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States ... unless written consent of the owner of such trademark is produced at the time of making entry. ...

(c) Any person dealing in any such merchandise may be enjoined from dealing within the United States or may be required to export or destroy such merchandise ... and shall be liable for the same damages and profits provided for wrongful use of a trademark ...

15 U.S.C. § 1526 (1980)

Defendants contend that § 1526 does not apply to the ACB Defendants because they did not import the goods into this country and their activities were solely within Canada. "While subsection (a) bars importation and might be construed to apply only to importers, subsection (c) specifically provides a remedy against '[a]ny person dealing in any such merchandise.'" *Disenos Artisticos E Industriales, S.A. v. Work*, 676 F.Supp. 1254, 1271 (E.D.N.Y.1987) (finding a distributor liable under the Act). The complaint alleges that the ACB defendants were responsible for and beneficiaries of an illegal scheme to sell counterfeit goods in the United States under Houbigant labels. This sort of involvement makes them a person under section (c) and thus subject to liability.

The claim will not be dismissed.

### The Claim under G.B.L. § 368–d is Sufficiently Alleged

Section 368–d of the G.B.L. provides that:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

G.B.L § 368–d (McKinney's 1984).

"The gravamen of a dilution complaint is that continuing use of a mark similar to

plaintiff's will inexorably have an adverse effect upon value of plaintiff's mark and that, if plaintiff is not protected, its mark will eventually be deprived of its distinctiveness." *King Research Inc. v. Shulton, Inc.,* 324 F.Supp. 631, 638 (S.D.N.Y.1971), *aff'd* 454 F.2d 66 (2d Cir.1972).

■ The fact that the claim in this case relates to similar products does not render § 368–d inapplicable. The Court of Appeals interpreting New York law and resolving a dispute among the district Courts, recently held that the section is applicable to claims by competitors as well as non-competitors. *Nikon, Inc. v. Ikon Corp.,* 987 F.2d 91, 96 (2d Cir.1993). In reaching this conclusion, the Court of Appeals considered the New York Court of Appeals' decision in *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977), cited by defendants and rejected defendant's interpretation that the section only protected marks from dissimilar products. *See Nikon,* 987 F.2d at 96.

The plaintiffs have alleged that sale of the inferior and counterfeit Chantilly product in this district has diluted the real mark. The motion to dismiss this claim will be denied at this time. It remains, however, for plaintiffs to prove that they possess a strong and distinctive trademark and that the mark is likely to be diluted by defendant's mark. *See Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026 (2d Cir. 1989).

### The Complaint States a Claim Under GBL §§ 349, 350 and 350–a

The seventh and thirteenth claims for relief allege violations of G.B.L. sections 349, 350 and 350–a.

■ Section 349 makes unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. Section 350 prohibits "[f]alse advertising in the conduct of any business." To state a claim under either of these sections, a plaintiff must allege (1) that the defendant engaged in an act or practice that is deceptive or misleading in a material respect and (ii) that plaintiff suffered injury as a result thereof.

*See Ortho Pharmaceutical Corporation v. Cosprophar, Inc.,* 32 F.3d 690, 697 (2d Cir. 1994); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995).

■ Contrary to ACB's assertions, the *Oswego* court made clear that a claim pursuant to § 349 "does not require proof of justifiable reliance." *Oswego,* 85 N.Y.2d at 25–26, 623 N.Y.S.2d 529, 647 N.E.2d 741. Thus, the lack of such pleadings is not fatal. The Complaint alleges that ACB defendants manufactured and shipped into New York counterfeit Houbigant products, which defendants claimed were genuine.

■ ACB's primary objection to these claims is that the plaintiffs as competitors and not consumers and have no standing to raise the claims under these sections. While it is true that the courts have found that the primary focus of these laws is consumer protection, *see Oswego,* 85 N.Y.2d at 24, 623 N.Y.S.2d 529, 647 N.E.2d 741 ("section 349 is directed at wrongs against the consuming public"), it is also true that the courts have held that competitors have standing to challenge deceptive practices under Sections 349 and 350 so long as "some harm to the public at large is at issue." *Weight Watchers Intern., Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1284 (S.D.N.Y.1990). *See also, Revlon, Inc. v. Heaven Scent Cosmetics, Ltd.,* 1991 WL 200209 at *4 (E.D.N.Y.1991) ("While the statute does not preclude an action by one business against another, the gravamen of the complaint must be consumer injury or harm to the public interest.") (*quoting Azby Brokerage, Inc. v. Allstate Insurance Co.,* 681 F.Supp. 1084, 1089 (S.D.N.Y.1988)); *Princeton Graphics v. NEC Home Electronics,* 732 F.Supp 1258, 1267 (S.D.N.Y.1990) ("[W]hile the purpose of the statute is to protect consumers, it does not disable a competitor from bringing an action pursuant to the statute if the nature of the claim asserted directly effects the interest of consumers."); *Construction Technology v. Lockformer Co., Inc.,* 704 F.Supp. 1212, 1222–23 (S.D.N.Y. 1989) (finding that competitor had standing to sue under §§ 349 and 350).

 The claims survive a motion to dismiss insofar as the complaint alleges that ACB Companies were part of an "unlawful scheme to export and sell counterfeit Houbigant goods in the United States" and that the settling defendants imported these counterfeit goods "with the intent to cause confusion and mistake, to deceive customers as to the source and origin of the products." The false advertising of the Chantilly would involve a public harm if proved. *See Weight Watchers Intern., Inc.,* 744 F.Supp. at 1285.

The seventh and thirteenth claims will not be dismissed.

### Plaintiffs Have Stated a Claim Under GBL § 133

New York General Business Law § 133 provides that:

No person, firm or corporation shall, with intent to deceive or mislead the public, assume, adopt or use as, or as part of, a corporate, assumed or trade name, for advertising purposes or for any other purpose, any name, designation or style, or any stile, or any symbol or simulation thereof, or a part thereof, which may deceive or mislead the public as to the identity of such person, firm or corporation or as to the connection of such person, firm or corporation with any other person, firm or corporation ...

 New York Courts have held that the elements of the claim include the intent to deceive the public and the assumption of the identity of another. *See Specialty Box & Packaging Co., Inc. v. Tobin Howe Specialty Co.,* 59 A.D.2d 961, 399 N.Y.S.2d 298 (3rd Dept.1977) (stating that one element is intent to deceive public); *Corcoran Marble and Monuments, Inc. v. Corcoran,* 122 A.D.2d 245, 505 N.Y.S.2d 641 (2d Dept.1986) (stating that there must be an issue of fact regarding the intent to adopt the other parties business name). Viewing the pleadings in the light most favorable to the non-movants, these elements have been pled. The complaint alleges that Defendants produced "large quantities of fragrances appearing to be licensed products but which were, in fact, counterfeit products of inferior quality designed for sale in the United States" which are being sold to "the unsuspecting public as genuine Houbigant."

The parties have provided no authority that the sale of counterfeit products is not addressed by this provision. Indeed it appears that it would. If these allegations are proved, a claim under section 133 would stand. The claims will not be dismissed.

### PPI's Claim for Tortious Interference with Business Relations Will Not be Dismissed

In Count 15 of the complaint, PPI charges the ACB defendants with tortious interference with business relations, alleging that they acted willfully and maliciously and/or by unlawful, means for the purpose of impairing PPI's business relations with its customers throughout the United States, causing damage to PPI. As reviewed above, Defendants are alleged to have been part of a scheme to manufacture "counterfeit" perfume for sale in the United States in violation of Trademark restrictions and the exclusive licensing agreement.

 To state a cause of action for tortious interference with business relations: a plaintiff is required to show "the defendant's interference with business relations existing between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are 'dishonest, unfair or in any other way improper.'" If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct. (Emphasis in original) (Citations omitted). *PPX Enters., Inc. v. Audiofidelity Enterps., Inc.,* 818 F.2d 266, 269 (2d Cir.1987); *see also Volvo N. Am. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 74 (2d Cir. 1988); *Robert J. McRell Assocs. v. Insurance Co. of N. Am.,* 677 F.Supp. 721, 729 (S.D.N.Y.1987); *Strapex Corp. v. Metaverpa, N.V.,* 607 F.Supp. 1047, 1050 (S.D.N.Y.1985).

 It is conceded for the purposes of this motion, that the acts were in part those of competitors, thus the requirement of "criminal or fraudulent conduct" is invoked. PPI has alleged that the ACB defendants interfered with the business relations existing between PPI and its customers by its

participation in a scheme to sell counterfeit product in this District. If the allegations are true, that in violation of the trademark agreement and the exclusive license to sell the product in the United States, the ACB defendants sold counterfeit product in this District, it would be true that defendants used "improper means" to compete. *See, e.g. Schmid, Inc. v. Zucker's Gifts, Inc.,* 766 F.Supp 118, 122 (S.D.N.Y.1991) (holding that if proven, knowing violations of exclusive distribution contract, could be characterized as criminal or fraudulent). On a motion to dismiss, the allegations are thus sufficient to defeat the motion. *See, L.G.B. Inc. v. Gitano Group, Inc.,* 769 F.Supp. 1243, 1254 (S.D.N.Y.1991).

### The Sixteenth Claim Fails to State a Claim for Third Party Beneficiary

The Sixteenth claim for relief was brought by PPI against ACB Mercantile based on a theory of third party beneficiary for an alleged breach of the License Agreement between Houbigant and ACB Mercantile. The relevant provision of the agreement, cited in the Complaint, states:

> The Licensee [8] shall not sell, directly or indirectly, any Products outside the territory [9], or establish any branch or maintain any office or depot in relation to the Products anywhere outside the territory, without the prior, written consent of [Houbigant].

The Seventeenth claim for relief by PPI against ACB Companies, Giuliano, Celaya and Pellerin asserts that the Asset Purchase Agreement between PPI Canada and these defendants contained the following relevant provision:

> Each seller shall not, for a period of three (3) years from the date of this Agreement, however caused, directly or indirectly ... (b) engage, through or in connection with any person, in any facet of the Business anywhere in the world or compete in any way anywhere in the world with the Business being conducted by the Purchaser or any of its affiliates.

■ It is well established that courts may look at the surrounding circumstances as well as the agreement when determining whether a third party beneficiary exists, *Septembertide Publishing, B.V. v. Stein & Day, Inc.,* 884 F.2d 675, 679 (2d Cir.1989), as "it is well-settled that the obligation to perform to the third party beneficiary need not be expressly stated in the contract." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir.1991); *see also Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.,* 807 F.Supp. 1007, 1020 (S.D.N.Y.1992) (stating that "[a]lthough the parties' intention to benefit the third-party must be gleaned from the face of the contract, *In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F.Supp. 712, 733 (S.D.N.Y.1989), the defendant's obligation to the third party beneficiary need not be explicitly stated in the contract itself. *Vista Co. v. Columbia Pictures, Inc.,* 725 F.Supp. 1286, 1296 (S.D.N.Y. 1989)."). In fact, the identity of a third-party beneficiary need not be known at the time of a contract's execution, *See M.K. West Street Co. v. Meridien Hotels, Inc.,* 184 A.D.2d 312, 584 N.Y.S.2d 310, 313 (1st Dept.1992). Where a material issue of fact is in dispute, summary disposition would be inappropriate. *Id.*

The New York Court of Appeals has stated that a third party beneficiary must establish that he or she has a "right to enforce the contract" or "the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party." *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 45, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985). *But see Strauss v. Belle Realty Co.,* 98 A.D.2d 424, 426–27, 469 N.Y.S.2d 948 (2d Dept.1983) (to enforce promise third party need not be identified in contract but need only show intent of contracting parties to benefit third party).

■ Moreover, it is not the intention of the promisor which governs whether an intended third party beneficiary has enforceable rights under a contract. Rather, it is the expressed intent of the promisee which

---

8. According to the complaint the Licensee is ACB Mercantile.

9. The territory for the purposes of this agreement is Canada.

determines whether the beneficiary is entitled to the benefits of the agreement. *Drake v. Drake,* 89 A.D.2d 207, 209, 455 N.Y.S.2d 420, 422 (4th Dept.1982) (holding "the intention of the promisee is of primary importance, since the promisee procured the promise by furnishing the consideration therefor.") (citation omitted); *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir.1991) ("An intended third party beneficiary will be found when it is appropriate to recognize a right to performance in the third party and the circumstances indicate that the promisee intends to give the third party the benefit of the promised performance.") (citations omitted).

 While it is not required that intent to confer a third-party beneficiary right be proved on the pleadings, there must be some facts beyond a conclusory allegation that a party is a third party beneficiary, to survive a motion to dismiss. The pleadings, with respect to the Sixteenth claim, do not support a determination that the parties intended PPI to be a third party beneficiary to either of the agreements. PPI has failed to allege any factual circumstances which would support its claim that it was an intended third party beneficiary. The Complaint fails to detail any meetings or cite any language from the agreements which would support its assertion of such status. Accordingly, in the absence of any facts supporting PPI's conclusory allegations, the terms of the Agreement do not confirm an expressed or intended third party beneficiary status or the possibility that PPI was an intended third party beneficiary, and the sixteenth claim is hereby dismissed with leave to replead.

### The Motion to Dismiss the Seventeenth Claim is Denied

 The seventeenth claim recites language from the Asset Purchase Agreement that, at least, presents a material question of fact as to whether or not third party beneficiary rights were confirmed on PPI by the Agreement:

Each Seller shall not, for a period of three (3) years from the date of this Agreement, however caused, directly or indirectly …

(b) engage, through or in connection with any person, in any facet of the Business anywhere in the world or compete in any way anywhere in the world with the Business being conducted by the Purchaser [PPI–Canada] or any of its affiliates …

PPI is an affiliate of PPI–Canada. When, as here, a genuine issue exists as to the parties' intentions to benefit another, a triable issue of fact is presented and the claim will not be dismissed. *See M.K. West Street Co.,* 584 N.Y.S.2d at 313.

### Houbigant's Motions

The Houbigant defendants move pursuant to Fed.R.Civ.P. 12(b)(6) and 17(a) to dismiss the counterclaims of the ACB Defendants. Houbigant argues that there are two case ending theories of assignment and time bar that make resolution of only Claims 11, 12 and parts of Claims 5 and 10, necessary. According to Houbigant, Counts 1–10, 13–15 and 17 of the Counterclaim are premised on alleged breaches of ACB's exclusive Canadian license Agreement and that the claims relating to this agreement were assigned to PPI–Canada on December 12, 1994. This argument will be discussed below. The second "case ending" theory involves issues of time bar based on administrative and general bar dates in the Bankruptcy court. By opinion dated August 15, 1995, the defense of bar dates will be addressed by the Bankruptcy court, to whom these claims were referred. Houbigant asserts that counterclaims 1, 2, 3, 4, 6–9, 13, 14 and portions of claims 5, 10 and 15 will be dismissed as untimely by the Bankruptcy court. This Court will not address the timeliness issues.

### There is an Open Question as to Whether or Not the Assignment Bars Claims by ACB Pursuant to the License Agreement

 ACB concedes that it sold all of its known assets, including rights under the License Agreement to counterclaim defendant PPI–Canada. Pursuant to Article I of the Asset Purchase Agreement, ACB agreed to sell transfer, convey, assign and deliver to PPI–Canada all marketable securities of ACB, all of ACB's inventory, all of ACB's accounts and others receivables, all of ACB's machinery and operating equipment, all of

ACB's intellectual property and manufacturing know-how, all existing rights under specified agreements, and all goodwill relating to ACB's business. According to ACB, nowhere in Article I or any other provision in the Asset Purchase Agreement was there an express transfer or assignment of its legal claims or causes of action.

In fact, among the excluded assets identified in Section 1.2 of Article I of the Asset Purchase Agreement are "all rights of the Sellers in and to those pending legal proceedings brought by the Sellers [ACB] and set forth on *Schedule 3.1(o)*." Asset Purchase Agreement, Article I, § 1.2(d). According to Article III, Subsection "o" ACB warranted that "[e]xcept as set forth in Schedule 3.1(o) . . . there are no actions, suits, arbitrations, proceedings, charges or complaints instituted by or against, or to the knowledge of . . . [ACB]." ACB specifically assumed the legal proceedings of any of the ACB Companies set forth on Schedule 3.1(o).

 "An assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another, and, unless in some way qualified, it is properly the transfer of one whole interest in an estate or chattel or other thing." *Griffey v. New York Century Ins. Co.*, 100 N.Y. 417, 422, 3 N.E. 309 (1885); *See also, Miller v. Wells Fargo Bank Intern. Corp.*, 540 F.2d 548, 557–61 (2d Cir.1976).

The language of this contract to transfer assets is, however, in many ways qualified. There are numerous provisions that exclude assets from the transfer. Whether the right to assert these particular claims remains with ACB, many of which ACB asserts it had no knowledge of at the time it transferred the Canadian rights to PPI–Canada, is a question of fact not properly decided on a motion to dismiss. *See, e.g. Bell v. Leakas*, 1993 WL 77320 at *7, 1993 U.S.Dist. LEXIS 3352 at *21 (S.D.N.Y.1993) (denying motion to dismiss because there are "at least two rational interpretations of the contract . . . [a]t least at the early stage, the meaning

ascribed to the text by Plaintiffs will be taken as true for purposes of the present motion") (*citing Bank of America Nat'l Trust and Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir.1985)).

The contract neither stated that all unknown actions are excluded from this asset purchase agreement, nor did it say that actions which ACB alleges it did not know were transferred. Unlike the cases to which Houbigant cites, the asset purchase agreement in this case did not contain language that clearly transferred "all rights of plaintiff in or growing in any manner out of a contract" with any other party. *See James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc.*, 61 N.Y.2d 836, 473 N.Y.S.2d 960, 462 N.E.2d 137 (1984) and, as such is not the sort of clear assignment of all rights that New York law [10] requires to transfer these rights from the seller. *See Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 151–152 (2d Cir.1995).

 A contract is ambiguous if "it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone." *Id.*, 57 F.3d at 152 (*citing Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir.1990); *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). Finding that the contract as a whole is subject to more than one reasonable interpretation regarding the intent to assign claims not known, the motion to dismiss on the basis of assignment is denied. In addition, there are questions of fact regarding knowledge of the claims at the time of transfer which are relevant to the issue of assignment and which render dismissal for lack of standing inappropriate.

### Count I Alleging Fraud is Sufficient

 Fraud and breach of contract claims arising out of a single set of operative facts may be litigated simultaneously. *See*

---

10. The parties agree to the extent that Canadian law should govern these questions, New York law provides the same results and thus can appropriately be applied by this Court. The exceptions are Counts I and XII of the Counterclaim which are brought under the Canadian Trade Mark Act.

*Deerfield Comm. Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986) (seller's allegations that buyer of fragrances had no intention of abiding by the geographical restrictions stated a cause of action for fraud that was not duplicative of claim for breach of contract for violating geographical restrictions). Under New York law, it is also true,

> [w]here a fraud claim seeks to enforce no more than the breached promises and obligations of a contract, rather than additional damages incurred as a result of the breach, the claims are merely redundant and must be dismissed.

*R.H. Damon & Co. v. Softkey Software Prods. Inc.*, 811 F.Supp. 986, 992 (S.D.N.Y. 1993). In order to defeat a motion to dismiss a common law fraud claim, "a plaintiff must allege that they sustained damages in addition to those they could have anticipated in the event of a breach." *Damon*, 811 F.Supp. at 992.

■ ACB alleges that Houbigant concealed conflicting license agreements from ACB both before and after it finalized the ACB License Agreement. The concealment prior to the date that the License Agreement was finalized by the signing of the Bank Agreement in October of 1993, represents a separate injury from the alleged breaches of the contract after signing. ACB's loss from the breaches during the life of the contract are lost sales and profits, while the damages from the fraud prior to signing the Agreement are alleged to flow from the fact that ACB would not have entered the agreement had information regarding the Unilex Agreements not been concealed.

The count will not be dismissed.

### ACB Has Stated a Claim Under the Canadian Trade Marks Act

Houbigant makes two arguments as to why ACB has failed to state a claim under the Canadian Trade Marks Act. The first is that the Affidavit of Massironi contradicts the pleadings and thus the Court need not accept as true the allegations of the complaint. Second, it argues that ACB lacks standing to sue as an exclusive licensee. Both arguments fail at this stage.

■ The Court of Appeals has made clear that where a District Court is provided with materials outside the pleadings in the context of a 12(b)(6) motion to dismiss, it has two options:

> the court may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one from summary judgment under Fed. R.Civ.P. 56 and afford all parties the opportunity to present supporting material. *See* Fed.R.Civ.P. 12(b).

*Kopec v. Coughlin,* 922 F.2d 152, 154 (2d Cir.1991) (*quoting Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988)).

The Court has not converted this motion to one for summary judgment and therefore will not consider statements outside of the pleadings.

■ Section 53.2 of the Canadian Trade–Marks Act contains very broad provisions for relief for violations of the Act, which reads as follows:

> Where a court is satisfied, on application of any interested person, that any act has been done contrary to this Act, the court may make any order that it considers appropriate in the circumstances, including an order providing relief by way of injunction and an order providing for relief by way of injunction and the recovery of damages or profits and for the destruction, exportation or other disposition of any offending wares, packages, labels and advertising material and of any dies used in connection therewith.

Under the 1993 License, ACB received an exclusive license under certain trademarks in Canada. The Canadian Courts have read this provision broadly and would confer standing on ACB as an exclusive licensee to bring proceedings under Section 50(3) of the Trademarks Act. *See Tonka v. Toronto Sun,* 35 C.P.R. (3d) 24 (1991).

The count will not be dismissed at this time.

### Count III Alleging Breach of Fiduciary Duty will not Be Dismissed

Houbigant states that it is not necessary to reach this count, because it is not yet established that ACB is a creditor. Houbigant concedes appropriately that if ACB is a creditor, Houbigant owes it a fiduciary duty. *See Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). Assuming that ACB might be a creditor as it pleads it is, the third count for breach of fiduciary duty cannot and will not be dismissed at this time.

### Count IV Alleging Breach of the Implied Covenant of Good Faith and Fair Dealing Against Houbigant Will Be Dismissed

A duty of good faith and fair dealing is implicit in every contract. However, a breach of that duty will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for a claim for breach of covenant of an express provision of the underlying contract. *See Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991). The allegations recited in the fourth count for breach of covenant of good faith and fair dealing against Houbigant are no different from those allegations covered by other allegations within the complaint. As redundant, the count will be dismissed.

### There is no Actionable Tort for Civil Conspiracy and Thus Count Five will be Dismissed

The Houbigant defendants also move to dismiss Count V of the Counterclaim complaint which states a separate cause of action for civil conspiracy and punitive damages. New York law does not provide a substantive tort of civil conspiracy. *Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.,* 871 F.Supp. 709, 731 (S.D.N.Y.1995) (*citing Danahy v. Meese,* 84 A.D.2d 670, 446 N.Y.S.2d 611, 614 (4th Dep't 1981); *Cunningham v. Hagedorn,* 72 A.D.2d 702, 422 N.Y.S.2d 70, 73 (1st Dep't 1979); *see also John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. 156, 161 (S.D.N.Y.1991) (stating that civil conspiracy is not of itself actionable under New York law). Instead, a party is required to plead the specific acts that constitute an independent tort. *John's Insulation, Inc.,* 774 F.Supp. at 161.

Allegations of conspiracy are permitted, however, to show that the substantive tortious acts complained of flowed from a common scheme or plan and to connect each defendant with an actionable injury. *Innovative Networks, Inc.,* 871 F.Supp. at 731 (*citing Danahy v. Meese,* 84 A.D.2d 670, 446 N.Y.S.2d at 614.) Thus, allegations of civil conspiracy are proper "for the purpose of establishing joint liability by co-participants in tortious conduct." *John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. at 162 (*citing Grove Press, Inc. v. Angleton,* 649 F.2d 121, 123 (2d Cir.1981)).

In Count V of the counterclaim complaint, ACB alleges that the Counterclaim Defendants worked in concert to facilitate:

a scheme by which (a) Houbigant fraudulently concealed that it authorized third parties to manufacture, distribute and sell a vast quantity of Parfums Parquet fragrances of divergent quality in competitions with ACB, including those made available pursuant to the Unilex Agreements, and misrepresented the nature of Houbigant's fragrances and operations; (b) the Counterclaim Defendants sought to abrogate ACB's rights under the ACB–PPI Agreement, by . . . making fraudulent oral and written representations to the Bankruptcy Court and; (c) the Counterclaim Defendants brought false and injurious claims against ACB, all of which were undertaken by implicit agreements for the benefit of each of the Counterclaim defendants . . .

To the extent that the substantive torts survive, the conspiracy allegations serve the proper purpose of allowing the acts of each of the defendants to be attributed to the others. *See Innovative Networks, Inc.,* 871 F.Supp. at 731 (*citing Alco Standard Corp. v. Schmid Bros., Inc.,* 647 F.Supp. 4, 7–8 (S.D.N.Y. 1986)) (denying motion to dismiss where conspiracy claim merely imputed the acts of one defendant to the others). Insofar as this Count attempts to state a separate cause of action, it is dismissed.

### ACB's Lanham Act Claim is Dismissed

■ "The failure of a licensor to protect its licensees from infringing products may breach contractual obligations or give other claims for relief but it cannot form the basis for a false designation of origin claim." *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.*, 1988 WL 31881 at *2 (S.D.N.Y.1988). The Court in *Silverstar Enterprises, Inc. v. Aday*, 537 F.Supp. 236, 241–242 (S.D.N.Y.1982) also held that an exclusive licensee could not sue a licensor under the Lanham Act. Appropriately, both courts found that the cause of action sounded in breach of contract, not under "marketplace rules [established by the Lanham Act that] establish marketplace rules governing the conduct of parties not otherwise limited [by a contract]." The conclusion is echoed by one of the leading commentators on trademark law:

> A licensee cannot sue its licensor for trademark infringement. This conclusion can be reached either by application of the license estoppel doctrine or by the general principle that the licensee acquires no title to the mark.

McCarthy on Trademarks § 18.20 at 18–97.

■ ACB lacks standing to assert violation of the Lanham Act and Count VI will be dismissed.

Even if ACB had standing to assert violations of the Lanham Act, they have not alleged a claim sufficient to withstand a motion to dismiss.

■ In order to state a claim under section 43(a) of the Lanham Act, ACB must allege that the false designation of origin or false description will result in a likelihood of consumer confusion. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir.1979); *Ballet Makers, Inc. v. United States Shoe Corp.*, 633 F.Supp. 1328, 1333 (S.D.N.Y.1986). A cause of action will only lie if the public would believe that a product is sponsored or otherwise approved by the mark's owner when in fact it is not. *Ballet Makers* at 1334.

■ Assuming that Houbigant has in fact authorized the Unilex agreements and allowed the infringing product to be sold in Canada, there is no confusion as to source; Houbigant approved both. Absent that confusion, *Ballet Makers* decides persuasively that there is no claim under § 43(a) of the Lanham Act. Again, there may be contract claims or other valid causes of action, but there would be no Lanham Act claim. Even if the doctrine of licensee estoppel did not apply, this count fails to state a claim.

### Counts Alleging Unfair Competition Under N.Y.Gen.Bus.Laws will be Dismissed; Count IX Alleging Common Law Violations Will Not be Dismissed

■ The standards for a claim under N.Y.Gen.Bus.L. 368–d are set forth above. In order to raise a claim for trademark dilution under this section, however, ACB "must possess a trademark or name which is truly of distinctive quality or one which has acquired a secondary meaning in the mind of the public. *See Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983). Since ACB did not possess any trademark name, but was simply Houbigant's licensee in Canada, it cannot assert a claim under 368–d.

Likewise, consistent with the discussion in earlier sections, claims under Section 349–a and 350, courts have found that the primary focus of these laws is consumer protection. *See Oswego*, 85 N.Y.2d at 24, 623 N.Y.S.2d 529, 647 N.E.2d 741 ("section 349 is directed at wrongs against the consuming public"), it is also true that the courts have held that competitors have standing to challenge deceptive practices under Sections 349 and 350 so long as "some harm to the public at large is at issue." *Weight Watchers Intern., Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1284 (S.D.N.Y.1990). *See also, Revlon, Inc. v. Heaven Scent Cosmetics, Ltd.*, 1991 WL 200209 at *4 (E.D.N.Y.1991) ("While the statute does not preclude an action by one business against another, the gravamen of the complaint must be consumer injury or harm to the public interest.") (*quoting Azby Brokerage, Inc. v. Allstate Insurance Co.*, 681 F.Supp. 1084, 1089 (S.D.N.Y.1988)); *Princeton Graphics v. NEC Home Electronics*, 732 F.Supp 1258, 1267 (S.D.N.Y.1990) ("[W]hile the purpose of the statute is to protect con-

sumers, it does not disable a competitor from bringing an action pursuant to the statute if the nature of the claim asserted directly effects the interest of consumers."); *Construction Technology v. Lockformer Co., Inc.*, 704 F.Supp. 1212, 1222–23 (S.D.N.Y.1989) (finding that competitor had standing to sue under §§ 349 and 350).

Unlike the claims in the Complaint, the counterclaim does not allege any harm to the public and as such Count VIII will be dismissed.

■ On the other hand, the complaint alleges unfair competition based on actions in violation of rights established by common law. Since the parties have agreed that New York law is similar to Canadian law on these claims, the Ninth Count cannot be dismissed for lack of territorial effect. Whether or not approval of the gray market activities rise to the level of unfair competition is a question that cannot be resolved on the pleadings.

### Counterclaim X for Tortious Interference with Contracts and Business Relations will Not be Dismissed

■ A claim for tortious interference with contract has four elements: 1) a valid contract between plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional procuring of its breach; and 4) damages. *See G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir.1995); *Guard–Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980).

■ It would be premature to dismiss this claim at this time where ACB has alleged tortious interference with the Asset Purchase Agreement and with customer contracts. In addition, based on the discussion of the law of tortious interference with business relations found above, the allegations of fraudulent concealment have been plead such that the cause of action will survive the motion to dismiss.

11. Since there are no allegations of defamatory writings, but only of spoken statements, the

### ACB Has Not Stated a Claim for Defamation Per Se Against the Houbigant Defendants

■ In order to survive a motion to dismiss Count XI, for Defamation [11], ACB must allege the following:

(1) an oral defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by the defendant, and (4) injury to the plaintiff.

*Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir.1993).

■ The sole allegation that links Houbigant to the allegedly defamatory statements of Robinson is the conclusory allegation that Houbigant was complicate in the PPI decision to hire "an investigation firm ... to help develop claims against ACB." Such a relationship to the alleged defamatory statements is too attenuated, without more specifics, to state a claim for defamation against the Houbigant plaintiffs and Count XI is, therefore, dismissed. *See Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F.Supp. 661, 668 (S.D.N.Y.1991).

The Court need not reach the *per se* portion of this claim as to the Houbigant Defendants. As discussed below in the "PPI Claims" Section of this discussion, the claim as a whole is dismissed for failure to meet the special requirements of a *per se* claim.

■ Section 7(a) of the Canadian Trade–Marks Act provides, in relevant part, that "[n]o person shall (a) make a false or misleading statement tending to discredit the business wares or services of a competitor." For the reasons stated above, the allegations attributing the defamatory statements to Houbigant are too attenuated to survive a motion to dismiss. Furthermore, section 7–A provides that the allegations must be made against a competitor. At the time these allegations were made, ACB had already assigned its license to PPI–Canada and Houbigant could not be considered ACB's competitor. For both of these reasons, Count XII is dismissed. For the latter reason, Count XII

Court will treat this as a claim for slander *per se.*

will also be dismissed against the PPI Defendants.

## The Contractual Indemnification Claim Will Not be Dismissed

■ Paragraph 12 of the ACB License Agreement between Houbigant and ACB reads:

> The Grantor [Houbigant] will defend the Licensee [ACB] against a claim that the sale of any of the Products infringes Patents or Trade Marks in the territory and the Grantor will pay resulting costs, damages and legal fees finally awarded, provided that the Licensee promptly notifies the Grantor in writing of the claim; and the Grantor has sole control of the defense and all related settlement negotiations.

Paragraph 22(2)(a) of the Agreement further provides "all obligations of indemnification shall survive and continue to bind the parties for two years after the date of the termination of the agreement."

ACB and Houbigant agree that this provision is unambiguous. The problem is that the interpretations differ. ACB argues that the capital "T" in Trade–Marks refers to a particular list of trademarked Houbigant products that are detailed in an appendix to the agreement and that since PPI and PPI–Canada have sued ACB for alleged violations of those products trademarks, Houbigant should indemnify ACB. Houbigant asserts that this interpretation defies logic and that the contract clearly covers actions brought by third parties against ACB for sales of legitimate product in Canada (the "Territory") that allegedly violates the third party trademark rights.

While the Houbigant interpretation seems more reasonable, the language of provision 12 is not unambiguous. The motion to dismiss is therefore denied.

## ACB's Claim for Common Law Indemnity is Dismissed

■ At common law, a party who "had committed no wrong, but by virtue of some relationship with the tort-feasor or obligation imposed by law, was nevertheless held liable to the injured party," was entitled to common law indemnification. *D'Ambrosio v.*

*City of New York,* 55 N.Y.2d 454, 461, 450 N.Y.S.2d 149, 435 N.E.2d 366 (1982). "[W]here one is held liable solely on account of the negligence of another, indemnification principles apply to shift the entire liability to the one who was negligent." *Id.* at 462, 450 N.Y.S.2d 149, 435 N.E.2d 366; *see also Guzman v. Haven Plaza Hous. Dev. Fund Co.,* 69 N.Y.2d 559, 516 N.Y.S.2d 451, 509 N.E.2d 51 (1987); *Rogers v. Dorchester Assocs.,* 32 N.Y.2d 553, 347 N.Y.S.2d 22, 300 N.E.2d 403 (1973). Generally such indemnity "is available in favor of one who is held responsible solely by operation of law because of his relation to the actual wrongdoer." *Mas v. Two Bridges Assocs.,* 75 N.Y.2d 680, 690, 555 N.Y.S.2d 669, 554 N.E.2d 1257 (1990).

■ ACB claims common-law indemnification against Houbigant claiming, in effect, that any wrongs committed by ACB are completely excused because Houbigant failed to police the operations of ACB as it is required to do under the trademark laws. ACB cites *Mas,* 75 N.Y.2d at 690, 555 N.Y.S.2d 669, 554 N.E.2d 1257 for the proposition that "implied in law indemnification is applicable when the proposed indemnitor has breached a duty to a third party but the proposed indemnitee has paid the third party for the loss attributable for the breach." The question answered by the New York Court of Appeals in *Mas* was whether indemnity is foreclosed by the finding that the proposed indemnitee was also found guilty of primary negligence on a separate theory of liability. After a careful weighing of the equitable considerations, the *Mas* Court found that where the indemnitor (an elevator company) had assumed the duty to inspect, repair and maintain the elevator, the Owner of the building, the indemnitee, should be indemnified by the elevator company for that part of the Owner's fault attributed to its negligence for maintaining the elevator. In that case, unlike the present one, the indemnitee acted in complete reliance on the performance of the indemnitor obligations.

The allegations in the complaint that ACB sold counterfeit products in the United States, if true, are not the sort of innocent behavior contemplated to be covered by common law indemnification. Nor is it the sort

of activity that one could reasonably attribute to Houbigant's failure to police. The failure to police, if proven, may act as a bar to other Houbigant claims, but would not require indemnification for the wrongful acts attributed to ACB. The motion to dismiss the common law indemnification claim is granted.

### Count XV Alleging Post–Petition Breaches of Contract will not Be Dismissed

 ACB alleges that Houbigant by continuing to authorize production of perfume under the Unilex Agreements which contemplated sales in Canada and the United States, by providing essential oils to Horley and R.A. French in order to make the perfume and by ceasing to supply hec to ACB in violation of the contract, breached its Agreement with ACB and that as a result ACB failed to satisfy certain of its existing orders and its relationship with its customers were damaged.

The parties agree that insofar as the claim relates to Houbigants' refusal to supply hec, the claim is for anticipatory breach. There is a factual dispute about whether or not Houbigant positively and unequivocally repudiated its duty to supply hec to ACB. This is a factual question which need not be resolved now. The motion to dismiss Count XV is therefore denied.

### Cancellation of Trademarks

ACB's final counterclaim is for cancellation of trademarks' registrations under the Lanham Act. ACB claims that it is entitled to a declaration: a) that Houbigant has abandoned its Chantilly and Raffinee trademarks, that PPI and PPI–Canada hold naked licenses to exploit such trademarks, that Houbigant, PPI and PPI–Canada (as its licensees) have forfeited any rights arising in connection with the Raffinee and Chantilly "trademarks," and that the Chantilly and Raffinee trademark registrations are cancelled.

ACB's claim is based on one of abandonment. In order to state a claim for abandonment under 15 U.S.C. 1127, which in pertinent part allows a mark to be deemed abandoned under the following circumstances:

(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from the circumstances. Non-use for two consecutive years shall be prima facie abandonment.

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.

ACB's claim is brought alleging (b).

In *Dawn Donut Co., Inc. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 366–67 (2d Cir. 1959), the Court of Appeals stated:

We are all agreed that the Lanham Act places an affirmative duty upon a licensor of a registered trademark to take reasonable measures to detect and prevent misleading uses of his mark by his licensees or suffer cancellation of his federal registration. The Act, 15 U.S.C.A. § 1064, provides that a trademark registration may be cancelled because the Trademark has been "abandoned." And "abandoned" is defined in 15 U.S.C.A. § 1127 to include any act or omission by the registrant which causes the trademark to lose its significance as an indication of origin.... The Lanham Act clearly carries forward the view of these latter cases that controlled licensing does not work an abandonment of the licensor's registration, while a system of naked licensing does.

 The counterclaim complaint is replete with allegations of naked licensing agreements being authorized by Houbigant. Houbigant asserts, however, that as a former licensee, ACB is estopped from asserting the abandonment. While in general a licensee is estopped from contesting the validity of its licensor's title to its trademark, *see Professional Golfers Association of America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 671 (5th Cir.1975), under the circumstances alleged in the counterclaims, this does not act as a bar in this case. Noting that facts that arise after a license expires are not barred by this estoppel doctrine, the First Circuit stated recently that:

... we can find no case that would even prevent a challenge by a prior licensee, based upon post-license facts, after the

license has expired. *See generally* 3 Callman, Unfair Competition, Trademarks & Monopolies § 19.48 (4th ed. 1989). We cannot think of any reason why such a licensee ought to be estopped; or why, a grant of a license should permanently immunize a trademark holder from legal attack. *Compare Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) (estoppel doctrine does not apply to patent licensees) with *Beer Nuts, Inc. v. King Nut Co.,* 477 F.2d 326, 328–29 (6th Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973) (estoppel doctrine does apply to trademark licensees). *WCVB–TV v. Boston Athletic Assoc.,* 926 F.2d 42, 47 (1st Cir.1991).

While Houbigant and PPI are right that the burden of proving abandonment is a heavy one, *see Warner Bros., Inc. v. Gay Toys,* 724 F.2d 327, 334 (2d Cir.1983), that is an entirely separate issue from whether or not the claim should be dismissed on 12(b)(6) grounds.

In this case where Houbigant has asserted Lanham Act claims against ACB, thus providing ACB with an interest in the validity of the U.S. mark, and ACB has alleged fraud, including that Houbigant approved naked licenses for the licensed product and withheld that fact from ACB, the claim for abandonment of the marks will not be dismissed on grounds of licensee estoppel.

Furthermore, were fraud not to overcome the licensee estoppel argument, the estoppel argument would not bar ACB from asserting abandonment of the U.S. mark, which forms the basis of the underlying Lanham Act Claim. ACB was licensed solely to manufacture and distribute the products in Canada, the allegations in the Complaint involve allegedly infringing acts in the United States.

For these reasons the Count will not be dismissed.

### Allegations Arising out of Pre-petition Conduct Cannot be Asserted Against Michael Sherman

The parties do not dispute that Sherman was not affiliated with Houbigant prior to the filing of the bankruptcy petition. Houbigant asserts that Counts I, III, and VI–IX are based solely on pre-petition conduct. Claims VI–VIII were dismissed and the other counts allege wrongful conduct post-petition. As such, the counts against Sherman will survive this motion to dismiss. There is no argument that Sherman cannot be held liable for the pre-petition conduct.

### Chemical Bank's Motion to Dismiss is Granted

Counterclaim defendant Chemical moves to dismiss the fourth count of ACB's counterclaim for breach of the implied covenant of good faith and fair dealing against Chemical.

■ Under the law of the province of Quebec and according to the law of New York, which the parties agree are in accord with those of Quebec on all salient issues, every contract implies of covenant of good faith and fair dealing. *See Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228, 230 (2d Cir.1991).

■ The implied covenant of good faith and fair dealing is breached "only where one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other." *Collard v. Incorporated Village of Flower Hill,* 75 A.D.2d 631, 427 N.Y.S.2d 301 (2d Dept.1980) (*citing Grad v. Roberts,* 14 N.Y.2d 70, 248 N.Y.S.2d 633, 198 N.E.2d 26 (1964)). The only agreement to which Chemical and ACB are parties is an Indemnification Agreement, whereby Chemical agreed to indemnify ACB for any liabilities which might result from the assignment of ACB's payments from Houbigant to Chemical. None of the claims in the counterclaim complaint relate to alleged breaches of this indemnification agreement.

ACB would have the court hold Chemical to a covenant of good faith and fair dealing as to contracts between Houbigant and ACB because "each of the various interdependent agreements are in fact part of a single unified agreement." While ACB has cited several sources which accurately stand for the proposition that where two or more writings are executed as part of the same general transaction, they are to be read together as part of the same agreement, it has pointed to no authority for imposing a duty of good faith and fair dealing on a party who is not a

party to the particular contract, even where there are several contracts that are part of the same transaction.

Count IV against Chemical is dismissed.

### *PPI's Motions*

PPI [12] has moved to dismiss Counts IV, V, VIII, X–XII, XVI and XVII. Consistent with the discussion above, Counts V, VIII, and XII were dismissed on 12(b)(6) against all defendants. Count XVII for Cancellation of Trademarks was not dismissed. While PPI moves to dismiss the count, it has not raised issues that were not already covered by this Opinion. Count XVII will not be discussed below. The merits of the motion to dismiss each of the other four counts will be considered in turn.

### *Count IV will Not Be Dismissed Against the PPI Defendants*

■ PPI–Canada is a signatory to the Asset–Purchase agreement and consistent with the discussion above had a duty of good faith and fair dealing with respect to that contract. The counterclaim complaint also implicates the PPI Entities as being part of the negotiation and contractual process leading to the Asset–Purchase Agreement and then alleges that PPI entered into a "side agreement" with Houbigant whereby the parties agreed to enter into a new Canadian license, in "complete disregard" of ACB's assignment and its rights.

■ While these allegations might be sufficient to establish other causes of action, they do not provide a factual basis upon which an implied covenant pursuant to a contract can be assigned to the PPI defendants other than PPI–Canada. While an implied covenant of good faith and fair dealing is inherent to every contract, see *Grad v. Roberts,* 14 N.Y.2d 70, 75, 248 N.Y.S.2d 633, 637, 198 N.E.2d 26, 30 (1964); *Collard v. Incorporated Village of Flower Hill,* 75 A.D.2d 631, 632, 427 N.Y.S.2d 301 (1980), *aff'd* 52 N.Y.2d 594, 439 N.Y.S.2d 326, 421 N.E.2d 818 (1981); *see also Lowell v. Twin Disc, Inc.,* 527 F.2d 767, 770 (2d Cir.1975), the duty of good faith and fair dealing cannot

be used to create new contractual rights between the parties, *see Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990).

The Plaintiffs have failed to allege that the PPI Entities, other than PPI–Canada, were bound by any agreement that gave rise to a duty of good faith and fair dealing in negotiating the Agreement or performing under it.

ACB argues in its motion papers that PPI, Kidd Kamm and Renaissance control every aspect of the Asset Purchase Agreement, thus making them liable for the subsidiary, PPI–Canada. *See Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Intern.,* 2 F.3d 24, 26 (2d Cir.1993). The counterclaims, however, do not allege complete control of PPI–Canada by other PPI Entities. The motion to dismiss this count against the PPI Entities, other than PPI–Canada is therefore dismissed.

### *Count X against PPI Entities and Bonoma will not be Dismissed.*

■ As discussed above, to state a cause of action for tortious interference with business relations a plaintiff is required to show "the defendant's interference with business relations existing between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are 'dishonest, unfair or in any other way improper.'" If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct. (Emphasis in original) (Citations omitted). *PPX Enters., Inc. v. Audiofidelity Enterps., Inc.,* 818 F.2d 266, 269 (2d Cir.1987); *see also Volvo N. Am. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 74 (2d Cir.1988), *Robert J. McRell Assocs. v. Insurance Co. of N. Am.,* 677 F.Supp. 721, 729 (S.D.N.Y.1987); *Strapex Corp. v. Metaverpa N.V.,* 607 F.Supp. 1047, 1050 (S.D.N.Y.1985).

■ The counterclaim complaint alleges that the PPI Entities hired an investigation firm, CTC, to help develop claims against

---

12. The PPI motion to dismiss is submitted on behalf of PPI, PPI–Canada, Bonoma, Renaissance, Kidd Kamm, CTC and Robinson.

ACB and that in the course of the investigation CTC employee Robinson with the approval of PPI Entities and Bonoma contacted business relations of ACB and told them that ACB "sold counterfeit goods" and that ACB was "running a clandestine operation." There are several other specific incidents recited in the counterclaim complaint of CTC, at the behest of PPI Entities and Bonoma, telling ACB clients falsely that the ACB product was defective. These allegations are sufficient to defeat a motion to dismiss this claim.

### Count XI Alleging Defamation Against the PPI Entities, Bonoma, CTC, and Robinson will Not be Dismissed

There are four elements necessary to establish a *prima facie* case of defamation, in this context:

(1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. *See* 2 NY PJI 104–05 (Supp.1991). The fourth element is presumed when the defamatory statement takes the form of slander *per se*, *Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 860–861, 605 N.E.2d 344, 347, 348 (N.Y., 1992), one form of which is an offending statement that affects the defamed person in its trade, occupation or profession.

*Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir.1993); *See Privitera v. Town of Phelps*, 79 A.D.2d 1, 3, 435 N.Y.S.2d 402, 404 (4th Dept.1981) (*citing Moore v. Francis*, 121 N.Y. 199, 203, 23 N.E. 1127 (1890); 2 N.Y. PJI 45–47 (Supp.); 34 N.Y.Jur., Libel & Slander, § 14 et seq.; Prosser, Torts (4th ed.), § 112, pp. 754–760; 1 Harper & James, The Law of Torts, § 5.9, pp. 374–375; Restatement, Torts 2d, § 570).

■ In this case either the offending words affect plaintiff in its trade, occupation or profession or ACB must plead and prove special damage. At the time that these alleged statements were made, however, ACB was no longer in the fragrances business and had no existing business that could be affected by the statements. As such, ACB would be required to plead special damages, which

it has failed to do, in order to make out a *prima facie* case of defamation. *See Korry v. International Tel. & Tel. Corp.*, 444 F.Supp. 193, 196 (S.D.N.Y.1978).

No special damages are pled for this count. New York Courts have required particular pleading of damages in cases of defamation. Absent any special damage allegation, the count must be dismissed against all parties. *See Angio–Medical Corp. v. Eli Lilly & Co.*, 720 F.Supp. 269 (S.D.N.Y.1989); *Christopher Lisa Matthew Policano, Inc. v. North American Precis Syndicate, Inc.*, 129 A.D.2d 488, 514 N.Y.S.2d 239 (1st Dept.1987).

### ACB Has Plead Count XVI Alleging Breach of Contract Sufficiently

■ Count XVI, incorporating the entire counterclaim complaint, alleges that in March 1995 the PPI Entities, on behalf of PPI–Canada repudiated the ACB–PPI Agreement and PPI–Canada's remaining obligations thereunder, including an obligation to pay ACB $1 million.

The complaint adequately alleges a breach of contract, but PPI asserts that the One Million dollars is in escrow and that disposition of the account is to be resolved in the Canadian Proceeding. This point has not been adequately briefed by either side and the motion to dismissed will be denied at this time absent a fuller briefing on the scope of the Canadian action. Consistent with the discussion above, the entire action will not be transferred to Canada.

### There is No Prima Facie Showing of Personal Jurisdiction over CTC or Robinson

■ The standards for pleading a *prima facie* case of jurisdiction over a person are set out earlier in this discussion. With the sole exception of a conclusory allegation that PPI–Canada, Robinson and CTC conduct business and tortiously caused injury in this jurisdiction, there is nothing in the pleadings that supports acts in this state or effects in this state of tortious acts outside of the state. Allegations made in the memoranda of law are insufficient to establish jurisdiction on the pleadings. With the exception of the law suit in this jurisdiction, ACB alleges that it has no contacts with this district. It is there-

fore hard to conceive of the effect in this district to which they might refer.

As there is no indication on the face of the counterclaim complaint that CTC or Robinson have submitted themselves to the jurisdiction of this Court, they are dismissed from this action.

### There is a Prima–Facie Showing of Personal Jurisdiction over PPI–Canada

■ ACB asserts that PPI–Canada is a Canadian corporation and a wholly-owned subsidiary of plaintiff, PPI. PPI–Canada has offices at 675 Massachusetts Avenue, Cambridge, Massachusetts and transacts substantial business both directly and through its parent corporations, PPI and Renaissance with the District of New York. PPI–Canada has appeared in the Houbigant Bankruptcy proceedings in the Southern District of New York, thus having purposely availed itself of the benefits and privileges of conducting judicial activities in this District and, by its presence, has subjected itself to the jurisdiction of this court.

■ While the mere fact that a corporate sibling or parent corporation is "doing business" in New York, does not mean that the related or subsidiary corporation is doing business unless it can be shown that one is the alter ego of the other. Consistent with the discussion above, however, it is not ACB's burden at this point to prove the alter ego theory. The counterclaim complaint alleges sufficiently that PPI and Renaissance acted on behalf of PPI–Canada in New York to establish a *prima facie* case for personal jurisdiction.

### Additional requests

The PPI defendants have urged the Court to consider Rule 11 sanctions against ACB. As no formal motion was made, however, it will not be considered at this time.

Finally, absent a formal motion or stipulation to dismiss Counts as redundant of claims in the Canadian Action, the Court will not dismiss them.

### Conclusion

The motions to dismiss claims, causes of action and parties are granted in part and denied in part consistent with the discussion above.

Upon resolution of the remaining issues by the Bankruptcy Court, a final discovery and pretrial order schedule will be set.

It is so ordered.