**TAP PUBLICATIONS, INC., Plaintiff,**

**v.**

**CHINESE YELLOW PAGES (NEW YORK) INC., Asia System Media, Inc., and John and Jane Does Nos. 1–100, Defendants.**

No. 95 Civ. 5043 (JGK).

United States District Court,
S.D. New York.

May 18, 1996.

George Shih and Richard Sablosky, New York City, for the plaintiff Tap Publications, Inc.

John W. Russell, New York City and Yee–Horn Shuai, pro hac vice, Pasadena, CA, for defendant Asia System Media, Inc.

Chris X. Lin, Lin & Li, New York City, for defendant Chinese Yellow Pages, Inc.

## OPINION

KOELTL, District Judge:

This case concerns a dispute over the right to use in the New York metropolitan area a trademark consisting of the four Chinese characters pronounced "Hua Shang Nien Chien" ("the mark"). The undisputed owner of the mark, which in English means "Chinese Business Yearbook," is the defendant Asia System Media, Inc. ("ASM"). ASM uses the mark as the title for the numerous Chinese business directories ASM and its licensees publish throughout the United States and Canada. The plaintiff Tap Publications Co. ("Tap") contends that it has the exclusive right to use the mark in the New York metropolitan area pursuant to a 1986 settlement agreement between ASM and Key Publications, Inc. ("Key"), Tap's alleged predecessor corporation, and that ASM violated the terms of this settlement by entering into a licensing agreement with defendant Chinese Yellow Pages (New York), Inc. ("CYPNY").

Tap initiated this action and made claims against both CYPNY and ASM under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for false designation of origin as well as under state trademark law and state law against unfair competition. In addition, Tap alleges that ASM breached the 1986 settlement agreement. ASM answered and counterclaimed against Tap, alleging that Tap infringed ASM's trademark rights in violation of 15 U.S.C. §§ 1114(1)(a) and 1125(a) and state trademark law, violated state laws against unfair competition, breached the 1986 settlement agreement, and tor-

tiously interfered with its contract with CYP-NY. Tap seeks injunctive relief, money damages, an accounting for profits, the turnover of profits, the destruction of all infringing publications from Asia System Media, Inc. ("ASM") and Chinese Yellow Pages (New York), Inc. ("CYPNY"), and attorney's fees. ASM seeks the same relief against Tap. CYPNY seeks only attorney's fees from Tap.

After denying the parties' motions for temporary restraining orders, the Court consolidated the cross-motions for preliminary injunctions with a trial on the merits pursuant to Fed.R.Civ.P. 65(a). The Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Jurisdiction over the federal causes of action is based on the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and 1121, and 28 U.S.C. §§ 1331 and 1338(a). Jurisdiction over the pendent state-law claims exists under 28 U.S.C. §§ 1338(b) and 1367(a).

2. Tap is a corporation organized and existing under the laws of the State of New York, and its principal place of business is New York. Tap is the publisher of the copyrighted Chinese language business directory entitled "Chinese Business Guide & Directory," which is published annually.

3. CYPNY is a corporation organized and existing under the laws of the State of New York. Its principal place of business is also New York. CYPNY publishes a Chinese language telephone directory.

4. ASM is a corporation organized and existing under the laws of the State of California, with its principal place of business in Monterey Park, California. ASM is engaged in the business of publishing or licensing to publish telephone directories that use the mark as a title. ASM and its licensees publish directories in several geographic regions in the United States and Canada.

5. ASM began using four Chinese Characters pronounced "Hua Shang Nien Chien" as its trademark and book title in 1983. These characters appear in a straight horizontal line on the front cover of ASM's publi-cations. (ASM Exh. C) (covers of ASM's publications.) ASM has continuously used this mark from that time to the present.

6. ASM registered the four Chinese characters that are pronounced "Hua Shang Nien Chien" as its trademark with the U.S. Patent and Trademark Office in the Supplemental Register on May 8, 1990 and in the Principal Register on November 30, 1993. (ASM Exh. G, H) (Certificates of Registration).

7. In 1985, ASM entered into a contract with Asia System Media (New York), Inc. ("ASMNY") to publish a telephone directory with these four characters in the New York market. Pursuant to the contract, ASMNY would be the sole distributor of Chinese language directories with the mark.

8. In 1986, Key filed an action against both ASMNY and ASM in the United States District Court for the Southern District of New York alleging copyright infringement, trademark violations (trade dress), unfair competition, and related claims. *Key Publications, Inc. v. Asia System Media, Inc.,* Civil Action No. 86–3403 (JMW).

9. This action was settled by agreement of the parties. The parties drafted an agreement in Chinese, which was translated into English by one of the attorneys for Key. Only the English language version was filed with the Clerk of the Court on May 27, 1986 as an Order and Stipulation of Settlement.

10. Pursuant to the terms of the settlement, as set out in both the original Chinese-language agreement and the English-language Order and Stipulation of Settlement entered by Judge Walker on May 27, 1986, Key was to add ASM's trademark, the four Chinese characters pronounced "Hua Shang Nien Chien," to the title on the cover of its telephone directory.

11. Pursuant to the terms of both the Chinese and English versions of the settlement agreement, ASM agreed not to publish Chinese telephone directories in the metropolitan New York area as long as Key published Chinese/English telephone directories in the metropolitan New York area; however, if Key ceased to publish a Chinese directory in the New York area, ASM would be permitted to publish a Chinese directory in

the New York area. (Tap Exh. 1; ASM Exh. E.)

12. No version of the 1986 settlement agreement offered by the parties expressly states whether a successor to Key would have the same rights to the mark that Key had. Tap was not mentioned in the 1986 agreement and did not play any role in the negotiation of the agreement; indeed, Tap did not even exist at the time. In addition, there is no evidence that the parties discussed whether Key should have the power to transfer its rights in the mark to a successor corporation.

13. Key was dissolved on March 20, 1992. (ASM Exh. L.) Key did not inform ASM of its dissolution.

14. Tap was incorporated on November 7, 1991. (ASM Exh. K.) (certificate of incorporation for Tap)

15. On February 19, 1992, Key executed an assignment of its copyrights for the 1992 Chinese Business Guide and Directory and "all other rights there in [sic]" to plaintiff Tap. (Tap Exh. 9.) ("Assignment") The purpose of this document was to transfer copyrights from Key to Tap and makes no mention of any rights Key may have had in the mark.

16. No notice of this assignment was given to ASM by either Key or Tap.

17. Neither Key nor Tap told ASM that Tap claimed status as a successor corporation to Key.

18. ASM has never licensed Tap to use the mark, nor has ASM otherwise transferred or consented to the use of the mark by TAP.

19. Since 1992, Tap has published an annual Chinese-language directory containing the Chinese characters pronounced "Hua Shang Nien Chien" on the cover. These characters are arranged in a square box, with two characters on top of the other two characters, and the box containing the characters is located at the top right corner of the cover. (Tap Exh. 7.)

20. Although the Chinese characters pronounced "Hua Shang Nien Chien" appear in a box in the upper right corner of the cover of Tap's directories, it is possible that customers would consider those characters as part of the title of Tap's publication.

21. The meaning of the Chinese characters pronounced as "Hua Shang Nien Chien" are the same whether they are arranged in a square or in a horizontal line.

22. ASM learned that Tap was using ASM's trademark and book title some time during 1992 when it acquired a copy of Tap's 1992 publication.

23. On December 15, 1992, ASM's attorney Danton Mak sent a cease-and-desist letter to Tap. (Tap Exh. 10.)

24. On December 28, 1992, Tap's attorney James R. Campbell sent a response to ASM's cease-and-desist letter to Mak. Campbell stated that Tap was previously known as Key Publication Inc. and was using ASM's trademark pursuant to the 1986 settlement agreement between Key and ASM. (Tap Exh. 11.)

25. By letter dated January 11, 1993, Mak informed his client ASM that Tap's position was that it was a successor-in-interest to Key and as such had the right to continue using ASM's trademark. (Tap Exh. 12.)

26. ASM did not take any further action against Tap until May 1995 when ASM's attorneys sent another cease-and-desist letter to Tap.

27. Meanwhile, in 1995 ASM had entered into an agreement with CYPNY permitting CYPNY to publish a telephone book/directory using the mark. (Tap Exh. 13; ASM Exh. J. ("Cooperation Agreement").)

28. On May 23, 1995, Tap sent CYPNY and ASM a cease-and-desist letter stating that pursuant to the 1986 stipulation Tap had the exclusive right to use the mark in the New York metropolitan area. (Tap Exh. 14.)

29. On May 25, 1995, ASM sent Tap a cease-and-desist letter that stated that Tap had no rights under the 1986 agreement to use the mark. (Tap Exh. 15.)

30. After it received Tap's May 23, 1995 letter, CYPNY decided not to use the mark on its publications. By notice dated May 25, 1995, CYPNY informed ASM of this fact and

thereby withdrew from its contract with ASM to use the mark. (Tap Exh. 16.)

31. Tap's business has not grown in any significant way from 1992 to the present, and Tap presented no evidence that it has used the mark to promote its business. Ms. Wang, the Chairman of the Board and President of Tap, testified that the mark was important to Tap only because the 1986 settlement agreement required use of the mark to carry out the agreement.

### CONCLUSIONS OF LAW

1. The plaintiff Tap first claims that both CYPNY and ASM violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). Tap alleges that with ASM's approval CYPNY placed advertisements containing the mark in various Chinese-language publications circulated in several states. Tap argues that by using the mark CYPNY misled the public that its directories were published by or affiliated with Tap.

2. Tap has no standing to assert a claim under the Lanham Act. Even assuming that Tap has the exclusive right to use the mark in the New York area as an assignee of the 1986 settlement agreement, a licensee has no right to sue the licensor under the Lanham Act. *In re Houbigant, Inc.*, 914 F.Supp. 964, 990 (S.D.N.Y.1995) (Sweet, J.), *clarified in part*, 914 F.Supp. 997 (S.D.N.Y. 1996); *Silverstar Enterprises, Inc. v. Aday*, 537 F.Supp. 236, 241–42 (S.D.N.Y.1982); *see also* 2 *McCarthy on Trademarks* § 18.20 at 18–97 (3d ed. 1996).

3. Moreover, Tap's claims against ASM are claims for breach of contract rather than Lanham Act claims. Tap concedes that ASM is the owner of the mark at issue in the case. Tap's claim that it has exclusive rights to use the mark in the New York metropolitan region rests solely on its claim that the 1986 settlement agreement gave this right to Key, which Tap alleges is its predecessor. Whether Key obtained this right and had the right to assign it to Tap involve questions of contract interpretation. The mere fact that a trademark was the subject of the contract does not convert a state-law breach of contract issue into a federal Lanham Act claim.

*See Stancato v. Versace*, No. 94 Civ. 4192, 1995 WL 437532, at *2–3 (S.D.N.Y. July 25, 1995) (Keenan, J.) (dismissing plaintiff's claim for Lanham Act violation because plaintiff's claim was essentially claim for breach of contract or fraud); *In re Houbigant, Inc.*, 914 F.Supp. at 990; *USAR Systems, Inc. v. Brain Works, Inc.*, 887 F.Supp. 84, 85 (S.D.N.Y.1995) (Leisure, J.) (dismissing action brought pursuant to copyright laws because case was really breach of contract case); *Silverstar Enterprises*, 537 F.Supp. at 241–42 (dismissing plaintiff's claim for Lanham Act violation, holding that plaintiff was simply trying to enforce a licensing agreement). As the court in *Silverstar Enterprises* noted, the "dispute should be determined by the principles of contract law, as it is the contract that defines the parties' relationship and provides mechanisms to address alleged breaches thereto. The Lanham Act, in contrast, establishes marketplace rules governing the conduct of parties not otherwise limited." 537 F.Supp. at 242. Therefore, the plaintiff has no claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

4. Tap also does not have a claim against ASM or CYPNY under N.Y.Gen. Bus.L. § 368–d for trademark dilution. Section 368–d provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

In order to state a claim under this section, Tap must show "(1) ownership of a distinctive mark, and (2) a likelihood of dilution." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir.1996); *see Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983); *In re Houbigant*, 914 F.Supp. at 990. Even if Tap had the right to use the mark under the 1986 settlement agreement, Tap admittedly does not possess the mark itself and claims only to be a mere licensee of ASM. Accordingly, Tap cannot state a claim

under section 368–d, and its claims against ASM and CYPNY based on this provisions must be dismissed. *See In re Houbigant,* 914 F.Supp. at 990 (dismissing licensee's action against licensor under section 368–d).

■ 5. Tap's breach of contract claim against ASM alleging that ASM violated the 1986 settlement agreement must also be dismissed because Tap has no rights to the mark under the 1986 settlement agreement.

6. It is undisputed that the 1986 settlement agreement did not expressly give Tap any rights in the mark. Indeed, Tap did not even exist in 1986. Tap claims instead that it enjoys the same rights to use the mark as its alleged predecessor Key did under the terms of the 1986 agreement because Key assigned Tap its rights under the agreement.

7. Tap's argument fails for two independent reasons. First, the 1986 settlement agreement did not give Tap the power to assign or transfer its rights in the mark. Second, the February 19, 1992 agreement between Tap and Key did not include any rights in the mark that Key may have had.

8. First, neither the Chinese nor English language settlement papers grant Key the right to assign its rights in the mark at issue: in this regard, the contract language is precise and unambiguous. Even if the contract were ambiguous on this issue, Tap did not present any evidence at trial that the parties intended that Tap would have such a right to assign or transfer. In fact, the settlement agreement granting Key the right to use the mark in the New York area indicates the contrary. Key's continued use of the mark was an express condition of the agreement, which specifically provided that

> [a]s long as Party A [Key] continues to publish Chinese/English telephone directories in the metropolitan New York area, Party B [ASM] agrees not to publish Chinese telephone directories or similar directories in the metropolitan New York area. If Party A ceases to so publish, then Party B shall be permitted to so publish.

Accordingly, it is clear that the rights conferred upon Key to use the mark in dispute were personal to Key, and that these rights were not assignable or otherwise transfer-

able. Thus, once Key dissolved in 1992, ASM regained the right to use its mark in the New York metropolitan area.

9. Tap's argument that trademark rights are assignable absent express language to the contrary is incorrect. A leading commentator on trademark law addressed the issue of whether a license to use a mark is assignable as follows:

> The right of a licensee to sub-license to others must be determined by whether the license clearly grants such a power. Similarly, the general rule is that unless the license states otherwise, the licensee's right to use the licensed mark is personal and cannot be assigned to another.

2 *McCarthy on Trademarks and Unfair Competition* § 18.14[2] (3d ed. 1996) (citing *Raufast S.A. v. Kicker's Pizzazz, Ltd.,* 208 U.S.P.Q. 699, 1980 WL 30295 (E.D.N.Y. 1980)); *see also* 3 *McCarthy on Trademarks and Unfair Competition* § 25.07[3] (3d ed. 1996). As the above treatise explains, "[s]ince the licensor-trademark owner has the duty to control the quality of goods sold under its mark, it must have the right to pass upon the abilities of new potential licensees." 3 *McCarthy on Trademarks and Unfair Competition* § 25.07[2] (3d ed. 1996).

10. Second, even if Key had the power to assign or transfer its rights in the mark under the 1986 settlement agreement, Key failed to make an effective transfer. Key claims that the February 19, 1992 document transferring Key's right, title, and interest in any copyright for the 1992 edition of its publication effectively transferred its right to the mark as well. This document makes no mention of trademark rights or licenses, however, and does not discuss any editions other than the 1992 edition, and the general recitation "... and all other right there in ..." is insufficient to effect the wholesale transfer Tap now claims. Tap failed to present any evidence that the parties intended this agreement to include the assignment of any rights Key had in the mark pursuant to the 1986 settlement agreement.

■ 11. Tap also sues ASM and CYPNY on the grounds of common law unfair competition. Under New York law, "the essence of

unfair competition ... is 'the bad faith misappropriation of the labors and expenditures of another likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 249–50 (S.D.N.Y.), *aff'd,* 923 F.2d 845 (2d Cir.1990); *see Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 35 (1995) (dismissing unfair competition claim under New York law because parties conceded there was no bad faith). Tap's unfair competition claims against both defendants must fail. As explained above, Tap has no rights to the mark, which forms the foundation of Tap's unfair competition claim. Furthermore, even if Tap did possess the rights to use the mark in the New York area under the 1986 settlement agreement, Tap has failed to demonstrate that ASM or CYPNY used the mark in this area in bad faith. Accordingly, Tap's unfair competition claims (Counts 5 and 7) must be dismissed.

12. Tap's remaining claim is against CYPNY pursuant to N.Y.Gen.Bus.L. § 133 for the use of a trade name with the intent to deceive or mislead the public.[1] Because Tap has no right to the mark Hua Shang Nien Chien, and because Tap has not shown that CYPNY had any intent to deceive, Tap has no cause of action against CYPNY pursuant to this statute.

13. ASM counterclaims that Tap's use of the Chinese characters pronounced "Hua Shang Nien Chien" infringes ASM's federally registered mark and constitutes unfair competition under both state and federal law. *See* 15 U.S.C. §§ 1114, 1125 (1986); N.Y.Gen. Bus.Law §§ 133, 368–d. In addition, ASM alleges breach of contract and tortious interference with contract claims against Tap. Tap concedes that it has used ASM's registered mark on its telephone directories from 1992 to the present but claims that the equitable doctrine of laches prevents ASM from recovering on any of its claims.

14. Because the Court found above that there is no contract between Tap and ASM, it is clear as a threshold matter that ASM has no claim against Tap for breach of the settlement agreement.

■ 15. A demonstrable likelihood of confusion is essential to ASM's state and federal claims alleging that Tap is liable for trademark infringement and unfair competition. This issue is determined by evaluating the following factors: (1) the strength of the senior user's mark; (2) the degree of similarity between the marks; (3) the proximity of the products; (4) the likelihood that the senior user will bridge the gap; (5) evidence of actual confusion; (6) the junior user's bad faith; (7) the quality of the junior user's product; (8) the sophistication of the relevant consumer group. *Hormel Foods,* 73 F.3d at 502 (citing *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961)); *Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 391 (2d Cir.1995) (same). This "list of *Polaroid* factors is not exclusive and the analysis of the factors is 'not a mechanical process.'" *Arrow Fastener,* 59 F.3d at 391 (quoting *Merriam–Webster, Inc. v. Random House, Inc.,* 35 F.3d 65, 70 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995)). "No single factor is dispositive" in determining whether a likelihood of confusion exists. *Id.*

■ 16. Because Tap brought the same claims for trademark infringement and unfair competition against ASM and argued forcefully in its papers that the Court should find that there was a strong likelihood of confusion resulting from Tap's and ASM's contemporaneous use of the Chinese characters pronounced "Hua Shang Nien Chien" on business directories published in the New York region, Tap itself has argued that the publication in the New York metropolitan area of two Chinese telephone directories bearing this mark is likely to cause confu-

---

1. Section 133 provides in relevant part:
   No person, firm or corporation shall, with intent to deceive or mislead the public, assume, adopt or use as part of, a corporate, assumed or trade name, for advertising purposes or for the purposes of trade, or for any other purpose, any name, designation or style, or any other symbol or simulation thereof, or any part of any name, designation or style, or any symbol or simulation thereof, which may deceive or mislead the public as to the identity of such person, firm or corporation or as to the connection of such person, firm or corporation with any other person, firm or corporation....

sion. *See* Plaintiff's Trial Memorandum of Law at 13–14. An analysis of the *Polaroid* factors indicates that this is true.

17. First, ASM has a strong mark. The "strength" of a trademark refers to a mark's " 'tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.' " *Arrow Fastener*, 59 F.3d at 391 (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). In the hierarchy of generic, descriptive, suggestive, arbitrary, and fanciful marks, the mark in this case appears to be descriptive. A descriptive mark receives protection only if its holder can demonstrate it has acquired secondary meaning. *See Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1340 (2d Cir.1992). A descriptive term acquires secondary meaning when "the consuming public associates the term with a particular source." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir.1992). The registration of the mark under 15 U.S.C. § 1052(f) creates a rebuttable presumption that the mark enjoys a secondary meaning. *Arrow Fastener*, 59 F.3d at 392 & n. 6. Tap has not only failed to rebut the presumption, it affirmatively asserts the strength of the mark. In any event, the mark in this case appears to have obtained significant secondary meaning as associated with the business directories affiliated with ASM. The mark appears on ASM's directories throughout the country, and testimony at trial established that the mark is widely known and associated with ASM publications.

18. The marks used by Tap and ASM are similar as well. Although Tap and ASM use the Chinese characters pronounced "Hua Shang Nien Chien" in different sizes and styles, both parties use the identical four Chinese characters on the covers of their respective publications, which are both Chinese-language business directories.

19. The competitive proximity of the products produced by ASM and Tap and the likelihood that ASM will enter the metropolitan New York market also point in ASM's favor. Both ASM and Tap are involved in the publication and distribution of substantially similar products. Although direct competition is not required to prove the likelihood of success, *Arrow Fastener*, 59 F.3d at 396, the parties in this case are in fact direct competitors. ASM is not only likely to break into Tap's market, but it has already attempted to do so. "Bridging the gap" refers to ASM's " 'interest in preserving avenues of expansion and entering into related fields.' " *Hormel Foods*, 73 F.3d at 504 (quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985)). ASM's first attempt to enter the market in the New York metropolitan area occurred in 1985 when it contracted with Key to produce a Chinese directory bearing the mark in the New York area; its most recent attempt occurred in 1995 when it contracted with CYPNY. ASM, which already produces Chinese directories bearing its mark in most major cities in the United States, stated at trial that it still intends to enter the New York area market and that it brought its counterclaims with that goal in mind.

20. Neither ASM nor Tap presented persuasive evidence that there was actual confusion between ASM's and Tap's publications. Tap had received only a few phone calls from advertisers who expressed some concern that there were now two directories using the name Hua Shang Nien Chien. In addition, one advertiser called Tap when it was clear that advertiser had actually placed an ad with ASM. (*See* Redirect of Wang.) This evidence falls short of proving actual confusion. Proof of actual confusion is not necessary, however, to prove the likelihood of confusion, especially given the relatively short period of time both CYPNY and Tap were publishing directories with the mark in New York. *See Arrow Fastener*, 59 F.3d at 397.

21. ASM has also failed to prove that Tap acted in bad faith. The *Polaroid* factor of "good faith" involves considering " 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.' " *Arrow Fastener*, 59 F.3d at 397 (quoting *Lang v. Retirement Living Publishing Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991)). Tap was clearly aware that the Hua Shang Nien Chien mark was ASM's registered trade-

mark; indeed, Tap claims that it used the mark pursuant to the 1986 settlement agreement that gave Key, Tap's alleged predecessor, the right to use this mark in the New York area. Although Tap received a cease-and-desist letter from ASM in 1992, it cannot be said that Tap acted in bad faith by continuing to use the mark after receiving this letter. Indeed, Tap immediately informed ASM that it was using the mark pursuant to the 1986 settlement agreement, and ASM did not take any action to protect its mark until almost three years later. If anything, the evidence indicates that Tap used the mark in good faith in reliance on ASM's failure to act.

22. The quality of Tap's product is relatively similar to that of ASM's product. When the quality of a junior user's product is similar to that of the senior user, there may be a likelihood of confusion of the source of the products. *Hormel Foods,* 73 F.3d at 505.

23. Finally, consumers of Chinese directories like those published by Tap and ASM are likely to be confused as to the source of the publications. Although the mark appears in a different color and configuration on Tap's publication than on ASM's publications, knowledgeable consumers would have reason to question whether ASM had licensed its mark to or was otherwise connected with Tap.

24. Although all of the Polaroid factors do not favor ASM, an analysis of the factors as a whole indicates that there is likelihood of confusion between ASM's directories and Tap's directories bearing ASM's mark.

25. ASM's first claim against Tap is for trademark infringement pursuant to 15 U.S.C. § 1114(1)(a). To prevail on a claim under 15 U.S.C. § 1114(1)(a), a plaintiff must prove that the defendant (1) without consent, (2) used in commerce, (3) a reproduction, copy or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion. 15 U.S.C. § 1114(1)(a); *see Arrow Fastener,* 59 F.3d at 390; *Gruner + Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir. 1993). ASM is entitled to prevail on this claim because it has proved all of the required elements: Tap has been using the

mark without ASM's consent in commerce, and this use is likely to cause confusion for the reasons stated above.

26. ASM is also entitled to recover against Tap under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides a provide right of action for injunctive relief and damages against

> [a]ny person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce....

15 U.S.C. § 1125(a)(1)(A); *see L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.,* 79 F.3d 258, 262 (2d Cir.1996). ASM has demonstrated that Tap used its mark on Tap's publications and that the use of this mark tended to cause a likelihood of confusion.

27. ASM's state statutory claim for dilution of its mark pursuant to N.Y.Gen. Bus.L. § 368–d provides an independent basis upon which to award ASM injunctive relief. ASM possesses a mark that has acquired secondary meaning; accordingly, the only issue is whether Tap's use of the mark is likely to dilute the mark. The likelihood of dilution may be shown by evidence of blurring or tarnishment of the mark. *Hormel Foods,* 73 F.3d at 506. Dilution by blurring may occur where a party uses or modifies another's mark to identity its goods and services, " 'raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.' " *Id.* (quoting *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir.1994)). As explained above, ASM and Tap both have argued that the use of the mark by two Chinese-language directories in the New York area is likely to confuse customers and thereby weaken the strength of the mark. Accordingly, ASM is entitled to injunctive relief pursuant to N.Y.Gen.Bus.L. § 368–d for trademark dilution.

28. ASM also claims that Tap is liable for tortious interference with ASM's contractual relations with CYPNY. To establish a claim for tortious interference with contractual relations under New York law, ASM must establish (1) a valid contract between ASM and a licensee; (2) Tap's knowledge of the contract and inducement of a breach; and (3) resulting damage to ASM. *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 797 F.2d 70, 75 (2d Cir.), *cert denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). Here, ASM and CYPNY entered into a contract which permitted CYPNY to use the mark on a Chinese-language business directory in the New York metropolitan area. In May 1995, CYPNY received a letter from Tap stating that Tap still had the right to use the mark pursuant to the 1986 settlement agreement. Upon realizing that Tap and ASM had a dispute over the rights to use the mark in New York, CYPNY stopped using the mark in its promotion efforts and notified ASM that it would no longer use the mark.

29. Litigation or the threat of litigation can give rise to a claim for tortious interference with contractual relations if the litigation or threat of litigation is "wrongful." *Id.* at 74. A lawsuit or threat of a lawsuit is considered wrongful "if the actor has no belief in the merit of the litigation" or if the actor has some belief in the merits of the litigation but "nevertheless institutes or threatens to institute the litigation in bad faith." *Id.* (citing Restatement (Second) of Torts § 767, cmt. c.). There is no indication that Tap wrote the cease-and-desist letter to CYPNY and brought this lawsuit in bad faith or without a genuine belief in the merits of the suit. Accordingly, ASM is not entitled to relief on its claim for tortious interference with contract.

30. ASM's claim against Tap for common law unfair competition must fail as well for similar reasons. As explained above, ASM can prevail on this claim only if it proves that Tap used the mark in bad faith. ASM has failed to prove that Tap acted in bad faith, and therefore it is not entitled to prevail on its unfair competition claim.

31. ASM is also not entitled to relief pursuant to N.Y.Gen.Bus.L. § 133 for the use of a trade name with the intent to deceive or mislead the public. ASM has failed to prove that Tap used the mark with the intent to deceive the public. *See Mullahey v. Waterford Citizen's Party, Inc.*, 136 Misc.2d 784, 785–86, 519 N.Y.S.2d 333, 334 (Sup.Ct. Sar.Co.1987) (dismissing section 133 claim where there was no evidence of intent to deceive); *Charles F. Ryan & Son, Inc. v. Lancaster Homes, Inc.*, 19 A.D.2d 14, 240 N.Y.S.2d 183 (4th Dep't 1963) (actual fraudulent intent is the essence of Penal Law § 964 [now § 133]).

32. ASM seeks injunctive relief, money damages, an accounting for profits, the turnover of profits, and the destruction of all infringing publications from Tap. Tap claims that the doctrine of laches bars all of ASM's claims for relief.

33. The Lanham Act provides injunctive relief as a remedy for violations of 15 U.S.C. §§ 1114 and 1125. *See* 15 U.S.C. § 1116(a). Injunctive relief is also available under N.Y.Gen.Bus.L. § 368–d. The Lanham Act also permits an award of damages if there is evidence of actual confusion and an accounting if there is a showing that the infringer acted in bad faith. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 752 (2d Cir. 1996).

34. Injunctive relief is the only relief available to ASM in this case. ASM is not entitled to an award of damages because ASM has offered no evidence of actual confusion; in fact, ASM presented no evidence of any pecuniary loss. Similarly, ASM is not entitled to an award of Tap's profits because it has not demonstrated that Tap acted in bad faith. *Id.*

35. Tap argues that ASM is not entitled to an injunction or any other relief because ASM is guilty of laches. In order to prevail on its laches defense, Tap must demonstrate (1) ASM had knowledge of the infringing activities; (2) ASM inexcusably delayed in taking action; and (3) Tap would be prejudiced if ASM belatedly asserted its rights to the mark. *Tri–Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir.), *cert. denied*, —— U.S. ——, 115

S.Ct. 484, 130 L.Ed.2d 396 (1994); *King v. Innovation Books,* 976 F.2d 824, 832 (2d Cir.1992); *Ediciones Quiroga, S.L. v. Fall River Music, Inc.,* No. 93 Civ. 3914, 1995 WL 103842, at *5 (S.D.N.Y. March 7, 1995) (Patterson, J.); *Mussington v. St. Luke's-Roosevelt Hosp. Ctr.,* 824 F.Supp. 427, 433 (S.D.N.Y.1993), *aff'd,* 18 F.3d 1033 (2d Cir. 1994). The laches defense has been used to bar both federal trademark claims as well as state statutory and common law claims. *See, e.g., Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1040–41 (2d Cir.1980); *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1355 (E.D.N.Y.1994) (Platt, C.J.); *Byron v. Chevrolet Motor Div. of Gen. Motors Corp.,* No. 93 Civ. 1116, 1995 WL 465130, at *6 (S.D.N.Y. Aug. 7, 1995) (Peck, M.J.) (listing cases). Furthermore, laches may bar both injunctive and monetary relief. *See Tri–Star Pictures,* 17 F.3d at 44 (laches bars injunctive relief); *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), *aff'd without op.,* 607 F.2d 995 (2d Cir.1979) (laches bars both kinds of relief). Judge Weinfeld summarized the defense of estoppel by laches as follows:

> Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time. Obviously, whether the claim is sufficient to bar relief, depends upon a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties.

*Cuban Cigar Brands,* 457 F.Supp. at 1096 (internal citations omitted); *see also Saratoga Vichy Spring,* 625 F.2d at 1040 (citing this passage with approval). The issue of laches is left to the discretion of the district court. *Tri–Star Pictures,* 17 F.3d at 44.

36. ASM has unreasonably and inexcusably failed to be diligent in protecting its trademark rights. ASM first learned that Tap was using ASM's trademark and book title some time during 1992 when it acquired a copy of Tap's 1992 publication. Soon thereafter, ASM sent a cease-and-desist letter to Tap. Tap informed ASM that Tap was previously known as Key Publication Inc. and was using ASM's trademark pursuant to the 1986 settlement agreement between Key and ASM. ASM never responded to Tap's letter. ASM did not do anything else to stop the infringement until May 1995, when ASM's attorneys sent another cease-and-desist letter to Tap. It is clear that ASM failed to pursue Tap's infringing activity for almost three years after first learning about it, and ASM offers no excuse for its delay. Thus, Tap has established that ASM has unreasonably delayed asserting its rights in the mark. *See, e.g., New Era Publications Int'l v. Henry Holt and Co., Inc.,* 873 F.2d 576, 584–85 (2d Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990) (laches barred injunctive relief where plaintiff failed to take any steps to enjoin infringing publication for two years; delay was "unconscionable"); *Byron,* 1995 WL 465130, at *6–7 (finding unreasonable delay where plaintiff sent two cease-and-desist letters and then did not bring suit for seven years); *McDonald's Corp. v. Druck & Gerner, D.D.S., PC.,* 814 F.Supp. 1127, 1137 (N.D.N.Y.1993) (plaintiff inexcusably delayed in asserting trademark rights when it did not send protest letter until two years after it received notice of infringement).

37. Tap has failed to demonstrate, however, that this delayed prejudiced it. Tap claims that ASM's delay caused it prejudice because it continued to publish its telephone directories pursuant to the 1986 settlement agreement, using the mark on the cover of its directories, and continued to promote and distribute the telephone directories in the metropolitan New York area. Tap does not argue that it has expanded its production, distribution, or advertising relying on the mark, and even failed to present any evidence that its advertisers or readers associate Tap's publication with the mark. Moreover, Tap's chairman and president showed very little interest in Tap's continuing ability to use the mark. Thus, Tap is not entitled to the defense of laches because it has not established that it was prejudiced by ASM's failure to prevent it from using the mark at an earlier time. *See Grotrian, Helfferich,*

*Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1343 (2d Cir.1975) (upholding finding that plaintiff had failed to show prejudice prong of laches defense; the plaintiff failed to show expansion in production or distribution in reliance on defendant's failure to act); *Warner–Lambert Co. v. Schick U.S.A., Inc.,* 920 F.Supp. 278, 289 (D.Conn.1996) (Nevas, J.) (finding that defendant must show expansion of production or distribution facilities or an increase in advertising and promotional expenses); *H & R Indus., Inc. v. Kirshner,* 899 F.Supp. 995, 1007 (E.D.N.Y.1995) (no prejudice shown where defendant made "no great investment" in its business in reliance on plaintiff's delay); *Imagineering, Inc. v. Van Klassens, Inc.,* 851 F.Supp. 532, 536 (S.D.N.Y.1994) (Carter, J.) (finding that defendant failed to prove prejudice from claims that it continued to manufacture and advertise its goods, expanded the product line, and hired additional employees); *Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 850 F.Supp. 232, 252–53 (S.D.N.Y.1994) (expenditures incurred in promoting the infringing articles do not constitute prejudice); *McDonald's,* 814 F.Supp. at 1138 (holding that defendant does not suffer the requisite prejudice when an injunction would merely require defendant to incur minimal expenses associated with removing the mark from the product); *Cuban Cigar Brands,* 457 F.Supp. at 1098 (laches defense "requires more by way of showing prejudice than the simple fact that the business continued during the period of delay").

38. In this case, an injunction can be appropriately directed to prevent Tap from using the mark on all future advertising and on all future editions of its business directories. The directories are published annually. Tap has failed to establish that it would be prejudiced if it were prevented from henceforth using the mark, which it has no right to use.

39. The claims by ASM and CYPNY for attorneys' fees are denied. Section 35 of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). In order to find that a case is "exceptional" under this provision,

there must be a showing of bad faith. *See Int'l Star Class Yacht Racing Ass'n,* 80 F.3d at 753; *Conopco, Inc. v. Campbell Soup Co.,* No. 93 Civ. 4245, 1995 WL 404847, at *1–2 (S.D.N.Y. July 6, 1995) (collecting cases). Because CYPNY has failed to prove that Tap acted in bad faith, CYPNY's claim for attorney's fees must be denied.

### CONCLUSION

For all of the foregoing reasons, the Court orders the following: (1) all of Tap's claims are dismissed; (2) all of ASM's claims are dismissed except for its claims for injunctive relief based on violations of 15 U.S.C. §§ 1114(1)(a) and 1125(a) and N.Y.Gen. Bus.L. § 368–d; and (3) all claims for attorneys' fees are denied. The parties shall submit a proposed judgment in accordance with this opinion by *May 24, 1996.* If the parties cannot agree on a proposed judgment, the parties shall submit counter proposed judgments by *May 28, 1996* with a brief explanation of the differences and the rationale for the different proposals.

**SO ORDERED.**